# EXHIBIT A

IN THE DISTRICT COURT OF ELLIS COUNTY
STATE OF OKLAHOMA

SHATTUCK HOSPITAL AUTHORITY,
an Oklahoma Public Trust and
NEWMAN MEMORIAL HOSPITAL,
INC., an Oklahoma Non-Profit
Corporation,

                Plaintiffs,

v.

PCH MANAGEMENT NEWMAN, LLC,
an Oklahoma Limited Liability Company;
PCH LAB SERVICES, LLC, an Illinois
Limited Liability Company;
PCH LAB SERVICES, LLC, a Delaware
Limited Liability Company;
SUN ANCILLARY MANAGEMENT,
LLC, a Texas Limited Liability Company;
MISSION TOXICOLOGY, LLC, a Texas
Limited Liability Company;
INTEGRITY ANCILLARY
MANAGEMENT, LLC,  a Texas Limited
Liability Company;
CORNERSTONE FORCES, LLC, a
Nevada Limited Liability Company;
JOHN DOES 1-10; and
THE SHATTUCK NATIONAL BANK,
N.A.

                Defendants.

Case No. CJ-2017-14

FILED
COURT CLERK'S OFFICE
Ellis County, Okla.

AUG 7 2017

Time_____M
SALLY WAYLAND, Court Clerk
By_____

## SECOND AMENDED PETITION

Plaintiffs, Shattuck Hospital Authority (the "Authority") and Newman Memorial Hospital, Inc. ("Newman") (collectively referred to as "Plaintiffs") bring this action for declaratory judgment pursuant to Okla. Stat. tit. 12 § 1651 and for money damages, against Defendants PCH Management Newman, LLC ("PCH"), PCH Lab Services, LLC, an Illinois limited liability company ("PCH Lab #1") and PCH Lab Services, LLC, a Delaware limited liability company ("PCH Lab #2" and collectively with PCH and PCH Lab # 1 the "PCH Defendants") and Sun

Ancillary Management, LLC, a Texas limited liability company ("Sun"); Mission Toxicology, LLC, a Texas limited liability company ("Mission"); Integrity Ancillary Management, LLC, a Texas limited liability company ("Integrity" and collectively with Sun and Mission the "Reference Lab Defendants"); Cornerstone Forces, LLC, a Nevada limited liability company ("Cornerstone"); John Does 1-10, and Shattuck National Bank, N.A. ("SNB") (collectively referred to as "Defendants"), wherein Newman and the Authority seek a declaration establishing their rights and obligations under certain contracts between Newman and the Authority and Defendants, injunctive relief; an accounting, and money damages. In support thereof, Plaintiffs state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Shattuck Hospital Authority (the "Authority") is a public trust existing under Oklahoma law.

2.    Plaintiff Newman Memorial Hospital, Inc. ("Newman") is a non-profit corporation existing under Oklahoma law.

3.    Defendant PCH Management Newman, LLC is a limited liability company existing under Oklahoma law.

4.    Defendant PCH Lab Services, LLC ("PCH Lab #1") is an Illinois limited liability company registered to do business in the State of Oklahoma.

5.    Defendant PCH Lab Services, LLC ("PCH Lab #2") purports by contract to be a Delaware limited liability company. It is not registered to do business in the State of Oklahoma.

6.    Defendant Sun Ancillary Management, LLC is a Texas limited liability company doing business in the State of Oklahoma but is not registered in the State of Oklahoma.

7.    Defendant Mission Toxicology, LLC is a Texas limited liability company doing business in the State of Oklahoma but is not registered in the State of Oklahoma.

2

8. Defendant Integrity Ancillary Management, LLC is a Texas limited liability company doing business in the State of Oklahoma but is not registered in the State of Oklahoma.

9. Defendant Cornerstone Forces, LLC is a Nevada limited liability company doing business in the State of Oklahoma but is not registered in the State of Oklahoma.

10. Defendant PCH and PCH Lab #1 have registered service agents in the State of Oklahoma. Sun, Mission, and Integrity have registered service agents in the State of Texas.

11. John Doe Defendants 1-10 are unknown entities and/or individuals whom Newman and the Authority are currently unable to identify despite diligent efforts. Upon information and belief, the John Doe Defendants, inside and outside of Oklahoma, are affiliates, subsidiaries, owners, investors, and/or contracting parties with PCH, PCH Lab #1, PCH Lab #2, Sun, Mission, Integrity, and/or Cornerstone.

12. Shattuck National Bank, N.A. is a national banking association with its principal place of business in Ellis County, Oklahoma.

13. Defendants conducted business in Ellis County, Oklahoma pursuant to contracts with Newman and/or the Authority.

14. The claims asserted in this action arise or occurred in Ellis County, Oklahoma.

15. Jurisdiction over the parties and the subject matter of this action, and venue in this Court is proper.

## STATEMENT OF FACTS

**A. The Beginning:**

16. In May of 2016, Newman was on the brink of closure and unable to make payroll.

17. Newman was actively seeking management companies who Newman was hopeful could offer a potential solution, but at no avail.

3

18.     The week that Newman thought it would have to announce to the Authority their intent to close the hospital doors as well as their inability to make their payroll; Newman became aware of People's Choice Hospital ("PCH") through PCH's attempt to take over management of the Sayre Memorial Hospital in Sayre, Oklahoma.

19.     Accordingly, contact was made with PCH on behalf of Newman to determine if PCH would be interested in managing Newman.  PCH knew of the financial perils of the Hospital.

20.     Within 48 hours of making contact with PCH, a team from PCH was on-site in Shattuck, Oklahoma.  PCH made presentations to Newman's board, Newman's management team, and the community of Shattuck, Oklahoma.  Throughout the presentations, PCH emphasized its experience in helping financially distressed rural hospitals and reassured Newman that it had successfully implemented a lab reference program at other hospitals without any issues.

21.     PCH represented that it could save Newman by implementing: (1) Empower, an electronic medical record program that would be functional and less expensive than the program Newman was using; (2) a drug rehabilitation program for wealthy private-pay patients who wanted to receive treatment away from where they lived; (3) telemedicine services to provide medically necessary specialist services and (4) an outpatient reference lab program that complied with all applicable laws.

22.     All of their representations appear to have been made to entice Newman to do business with PCH.

23.     PCH presented itself to Newman as their white knight who would save the hospital and set it on a course for success.

4

24.     Newman had no other available options to continue to provide medical services to the some 1,336 individuals in Shattuck, Oklahoma and based on the representations made by PCH; PCH's plan, as presented, appeared to be reasonable.

25.     In signing the Newman Hospital Management Agreement ("Hospital Agreement"), Newman granted to PCH nearly unfettered management and administrative control of the hospital to conduct business on its behalf. However, no authority was granted to do improper or perhaps illegal activities.

**B. The Management Agreement, Contracts, and Reference Lab:**

26.     On or about May 19, 2016, as amended on August 31, 2016, Newman and the Authority, with no other choice but to close the doors, entered into a Hospital Management Agreement ("Hospital Agreement") with PCH for the purpose of retaining PCH to provide certain healthcare management and other services to Newman for a management fee of five percent (5%) of gross hospital collections less recoupments or reimbursements to payor.

27.     The duties of PCH under the Hospital Agreement are enumerated in the agreement and included but are not limited to overseeing all operational matters for the Hospital; managing employees, paying Hospital's accounts and expenses, maintaining and revising accounting systems including assistance with issuing bills and collecting fees for services from payors and patients.

28.     Under the Hospital Agreement, PCH had the authority to enter into any proper contract or agreement that PCH, in sole discretion, deemed necessary. As a result, PCH had a fiduciary relationship with and responsibility to Newman.

29.     PCH provided supervision for Newman employees who reported directly to PCH.

30.    PCH and PCH Lab # 1 represented to Newman through oral representations and contracts that all programs instituted by PCH on behalf of Newman compiled with all federal regulations and statutes and complied with all of Newman's contracts with commercial private insurance carriers.

31.    PCH, on Newman's behalf and at Newman's expense, leased new laboratory equipment and hired additional laboratory employees to perform the laboratory work at Newman's laboratory located in Shattuck, Oklahoma.

32.    On or about May 19, 2016 as amended on August 31, 2016, Newman entered into a Laboratory Management Agreement ("Reference Lab Agreement") with PCH Lab #1 for the purpose of growing the overall revenue of the Hospital with the addition of a reference laboratory ("Lab Program") and to provide management services for the Lab Program for a daily fee of 30% of any and all fees collected by Newman for the Program less any payor recoupments and patient refunds.

33.    Newman was to bill for these reference lab services.  However, as part of its Hospital Agreement, PCH entered into an agreement on behalf of Newman for Integrity to handle the billing for an additional fee.

34.    On or about April 20, 2016, PCH, in the name of the Hospital and as its agent, entered into a contract with Sun ("Sun Contract") whereby Sun would provide consulting services to include laboratory and accession services.  The Sun Contract was signed by Seth Guterman, M.D. on behalf of Newman and Michael Murphy, M.D. on behalf of Sun.  Newman terminated the Sun Contract on June 13, 2017.

35.    On or about April 20, 2016, PCH, in the name of Newman and as its agent, entered into a contract with Mission ("Mission Contract") whereby Mission would provide consulting

6

services to include laboratory and accessing services. The Mission Contract was signed by Seth Guterman, M.D. on behalf of Newman. Newman terminated the Mission Contract on June 13, 2017.

36.     On or about May 27, 2016, PCH, in the name of Newman and as its agent, entered into a contract with Integrity ("Integrity Contract") whereby Integrity would provide exclusive billing services on behalf of Newman to commercial private insurance carriers for outpatient laboratory services allegedly provided by Newman. Newman terminated the Integrity Contract on June 15, 2017.

37.     On or about November 16, 2016, Newman entered into a Laboratory Management Agreement ("Expanded Facility Lab Agreement") with PCH Lab #2 (which purports to be a Delaware limited liability company) for the purpose of developing, managing, and operating an expanded laboratory facility in the Hospital which includes certain additional testing services for cardiology, diabetes, and chronic disease for a fee of 12% of the initial four million dollars in Net Collected Revenue and 20% of Net Collected Revenue in excess of four million dollars.

38.     The Expanded Facility Lab Agreement includes a $5,000,000 early termination penalty.

39.     PCH, on behalf of Newman, and as Newman, has entered into several agreements with third parties to perform services that PCH or PCH Lab #1 were to perform under the Hospital Agreement and Reference Lab Agreement. Each of the new agreements, for billing, space, lab management, personnel management, leasing, includes an additional fee over and above the fees already being charged and collected by Defendants.

40.     On or about April 21, 2017, Newman sent notice to PCH of default under the Hospital Agreement.

7

41.     The defaults under the Hospital Agreement included failure to properly bill or to bill for in-patient services at all, failure to provide adequate and safe Electronic Medical Records (EMR) system, failure to pay trade accounts resulting in collection lawsuits against Newman by vendors and the failure to comply with private payor contracts.

42.     Since the notice letter was sent on April 21, 2017, several insurance company payors have provided notice of investigation, audit, refusal to pay claims and termination of agreement due to the operation of a reference laboratory or laboratories. The investigations, audits, and threats extend to all agreements between Newman and payors, not just reference laboratory claims.

43.     On June 1, 2017, Newman sent notice of termination of the Hospital Agreement to PCH.

44.     On June 9, 2017, PCH sent correspondence to Newman rejecting the termination and billing the Hospital a $5,000,000 penalty for early termination of the Expanded Facility Lab Agreement.

**C. The Scheme:**

45.     As a result of the Hospital Agreement, PCH obtained an unfettered ability to manage and operate Newman. The problem is, PCH had no interest in managing and operating Newman in the best interest of Newman or the people of Shattuck, Oklahoma, but only the Program and how to make money for themselves at the expense of Newman.

46.     This is self-evident as PCH provided little to no training for Newman staff, PCH forced Newman to implement PCH's electronic medical records system, Empower, hospital wide although the platform is only built to support an emergency room; and failed to adequately manage the hospital.

47.     PCH also pressured Newman medical staff to approve credentials of physicians living out of state in violation of licensure requirements in order to implement the telemedicine program quickly, which the medical staff refused to do.

48.     PCH demonstrated a complete disregard for applicable laws, regulations and contractual obligations of Newman on numerous occasions.

49.     PCH began contracting on behalf of Newman with reference labs, billing companies, and other service providers. In so doing, PCH signed the contracts on behalf of Newman unilaterally, with no input from Newman.

50.     PCH, PCH Lab #1 and PCH Lab #2 (the "PCH Defendants"); Sun, Mission, and Integrity (the "Reference Lab Defendants") took advantage of Newman's in-network contracting provisions with private payors.

51.     Upon information and belief, the Reference Lab Defendants submitted claims to private payors under Newman's national provider identifier number for laboratory test in violation of Newman's provider agreements with payors.

52.     After the Reference Lab Defendants would submit their claims to the private payors under Newman's national provider identifier number, the private payors would pay Newman the entire balance of the claims submitted. In turn, at the direction of PCH, Newman would retain 5%, wire PCH Defendants 25%, and wire Reference Lab Defendants the remaining 70%.

53.     In an attempt to legitimize their scheme, PCH required Newman to purchase new equipment (unilaterally selected by PCH) and hire H1B employees for the lab.

54.     Further, PCH, in the name of Newman leased space and employees in San Antonio, Texas, and Sun and Mission would invoice Newman for the space and employees.

55.     PCH represented to Newman that the entire arrangement complied with the laws and regulations of Oklahoma and the U.S. Government.

56.     Upon information and belief, Cornerstone has likewise used and continues to use Newman's NPI in submitting claims.

57.     The PCH Defendants and Reference Lab Defendants performed the billing of the claims for lab services under Newman's name, CLIA certificate, and national provider identifier number.

58.     PCH kept Newman in the dark about the scope of the Lab Program by failing to provide accurate monthly financial reports as required by the Hospital Agreement.

**D. The Aftermath:**

59.     As a result of the illegal and/or fraudulent scheme set forth above, private payors began auditing Newman.

60.     PCH represented and affirmed that they were handling the negotiations with the payors and Newman had nothing to be concerned about, because PCH and Newman were following the law and it was a simple misunderstanding by the payors.

61.     Unfortunately, Newman took PCH's word at face value. However, payors began issuing termination letters and/or threatening to issue termination letters to Newman whereby, private payors such as: Aetna, BlueCross BlueShield of Oklahoma, Cigna, Humana, and UnitedHealthcare would stop paying claims submitted by Newman.

62.     At this point, Newman contacted the undersigned counsel. Through counsel, Newman has begun the path to rehabilitation by terminating the contracts with PCH Defendants and Reference Lab Defendants and contacting the private payors directly for the purpose of cooperating with the payors' investigations of the scheme outlined above.

## COUNT I: DECLARATORY JUDGMENT- THE HOSPITAL AGREEMENT

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through sixty-two (62), and further allege as follows:

63. Pursuant to the terms of the Hospital agreement, "PCH warrants that all services to be provided herein, whether by it directly or by approved sub-contractors of PCH, shall fully comply with applicable federal, state, and local statutes, rules and regulations." *See* Sec. 15.2. In addition, the Hospital Agreement is governed "by and interpreted under the laws of the State of Oklahoma, without resort to choice of law principles." *See* Sec. 37. Under Oklahoma law, a contract that is "[c]ontrary to an express provision of law; [c]ontrary to the policy of express law, though no expressly prohibited; or, [o]therwise contrary to good morals" is unlawful. *See* 15 O.S. § 211 et. seq.; *Kincaid v. Black Angus Motel, Inc.*, 983 P.2d 1016, 1018 (Okla. 1999).

64. Because PCH's business scheme is contrary to the law, contrary to good morals, and at the very lease contrary to policy of express law, the Hospital Agreement is an unlawful contract and, therefore, unenforceable.

65. PCH knew or should have known that the scheme would violate the contracts Newman had with the private payors.

66. As a result of PCH's conduct, all transactions, agreements, and contractors that were entered into by PCH on behalf of Newman were unlawful and unauthorized.

67. PCH represented that the management fee complied with applicable laws; however, the Hospital Agreement is invalid due to the percentage based payment formula contained therein.

68.     Further, in light of the limited scope and quality of the services that were provided by PCH to Newman, the management fee actually paid was not commercially reasonable.

69.     Therefore, Newman seeks a declaration from this Court that the Hospital Agreement which purports to grant PCH unfettered authority to manage Newman is void and unenforceable in its entirety, and was never a valid contract under the law of the State of Oklahoma. Further, since the Hospital Agreement was fraudulently induced and is invalid, PCH did not have the requisite authority to bind Newman, and all transactions, agreements, and contracts that were entered into by PCH on behalf of Newman were unauthorized and, likewise, void and unenforceable.

## COUNT II: FRAUD IN THE INDUCEMENT - THE HOSPITAL AGREEMENT

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through sixty-nine (69), and further allege as follows:

70.     Newman was in an untenable situation, on the brink of closure, when PCH arrived on the scene.

71.     PCH represented to the Hospital Board of Directors that they were a reputable business with a legitimate and legal plan to make Newman a going concern moving forward.

72.     Among other things, the PCH Defendants represented to Newman that the reference lab, and any other programs instituted by PCH, would comply with all federal regulations and statutes and complied with all of the Newman's contracts with commercial private insurance carriers.

73.     Relying on these representations, the Hospital Board of Directors entered into the Hospital Agreement which gave PCH significant control over Newman's operations.

12

74.     The PCH Defendants knew, based on their other experiences, that the manner in which the reference lab would work in actuality was not compliant with the necessary regulations and statutes or Newman's contracts with the private insurers.

75.     The PCH Defendants represented that the reference lab would be compliant in order to get the Hospital Board to enter the Hospital Agreement and to allow the PCH Defendants to operate Newman.

76.     Because of the actions of the PCH Defendants in inducing the Hospital Board to enter the Hospital Agreement, Newman has been significantly injured, including but not limited to, being susceptible to losing its contracts with a number of insurance carriers which would severely impact if not terminate Newman's ability to operate.     Accordingly, the Hospital Agreement should be declared void, and the PCH Defendants are liable to Newman and the Authority, jointly and severally, for compensatory and punitive damages, costs, attorney's fees, and such other relief as the court finds just and proper.

### COUNT III: FRAUD- PCH Defendants and Reference Lab Defendants

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through seventy-six (76), and further allege as follows:

77.     PCH Defendants and the Reference Lab Defendants have represented to the Newman and the Authority that the laboratory services billed and the Lab Program created by PCH Defendants and the Reference Lab Defendants are valid under all laws and regulations and that such Lab Program or billing did not violate any Payor's contract with Newman.

78.     Newman and the Authority relied on PCH Defendants' and the Reference Lab Defendants' assurances that the Lab Program created and advocated by PCH Defendants and the Reference Lab Defendants did not violate any regulations or contracts.

13

79.     Newman and the Authority relied on the representations of and actions taken by PCH in the Hospital laboratory and lease of new laboratory equipment in the Hospital's name as evidence that work being billed for laboratory services was appropriate and in compliance with all federal and state regulations and laws and with all contracts with Payors.

80.     PCH Defendants and the Reference Lab Defendants received notices of audits, terminations, and questions about the legitimacy of the Lab Program of which the PCH Defendants and the Reference Lab Defendants failed to inform Newman and the Authority until one of the Payor's contracts was within days of terminating.

81.     PCH Defendants and the Reference Lab Defendants actions and inactions constitute fraud against Newman and the Authority.  As a result of the fraud committed by the PCH Defendants and the Reference Lab Defendants, the Plaintiffs have been damaged in excess of $75,000.  Accordingly, PCH Defendants and the Reference Lab Defendants are liable to Newman and the Authority, jointly and severally, for compensatory and punitive damages, costs, attorney's fees, and such other relief as the court finds just and proper.

## COUNT IV: CONSPIRACY- PCH Defendants and Reference Lab Defendants

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through eighty-one (81), and further allege as follows:

82.     Upon information and belief, PCH Defendants and the Reference Lab Defendants agreed and conspired to engage in a course of conduct, jointly and severally, to commit fraud on Newman and the Authority as a result of billing for laboratory services which violate the Newman' various contracts with PCH Defendants and the Reference Lab Defendants and with the Payors.

83.     As a result of the conspiracy between PCH Defendants and the Reference Lab Defendants, the Newman and the Authority have been damaged.  Accordingly, PCH Defendants

and the Reference Lab Defendants are liable to Newman and the Authority, jointly and severally, for compensatory and punitive damages, costs, attorney's fees, and such other relief as the court finds just and proper.

## COUNT V: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS- PCH Defendants and Reference Lab Defendants

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through eighty-three (83), and further allege as follows:

84. PCH Defendants and the Reference Lab Defendants are aware of the Hospital's contractual obligations with private medical insurance companies or Payors. The PCH Defendants and the Reference Lab Defendants are aware that the reimbursement from the Payors is necessary for the Hospital's operations.

85. PCH Defendants and the Reference Lab Defendants knew or should have known that the Lab Program to which the PCH Defendants and the Reference Lab Defendants have obligated the Hospital would jeopardize or terminate the Payors' contracts with Newman.

86. PCH Defendants' and the Reference Lab Defendants' actions interfered with Newman's exiting contracts or future contracts with Payors.

87. Several Payors have either sent termination notices or have threatened terminate contracts which are vital to the Hospital's ability to operate.

88. PCH Defendants' and the Reference Lab Defendants' actions constitute tortious interference with existing contracts.

89. As a result of this tortious interference with existing contracts with Payors, Newman and the Authority have been damaged in excess of $75,000.

15

## COUNT VI: THE HOSPITAL AGREEMENT

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraphs one (1) through eighty-nine (89), and further allege as follows:

90.    A substantial controversy exists between Newman and the Authority and PCH concerning the termination of the Hospital Agreement.

91.    A substantial controversy exists between Newman and the Authority and PCH concerning the appropriateness and the legality of the operation of Newman by PCH.

92.    The controversy between Newman and the Authority and PCH regarding the Hospital Agreement is definite and concrete.

93.    The controversy between Newman and the Authority and PCH concern legal relations between Newman and the Authority and PCH and Newman and the Authority and PCH have interests adverse to the other.

94.    The controversy between Newman and the Authority and PCH are real and substantial so as to be capable of a decision granting or denying specific relief of a conclusive nature.

95.    The Court has the authority to declare the rights and obligations of Newman and the Authority and PCH with respect to the Hospital Agreement pursuant to Okla. Stat. tit. 12 § 1651.

## COUNT VII: THE REFERENCE LAB AGREEMENT

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraphs one (1) through ninety-five (95), and further allege as follows:

16

96.     A substantial controversy exists between the Hospital and PCH Lab #1 as to whether the Reference Lab Agreement has been terminated for failure to provide specimens pursuant to the Reference Lab Agreement.

97.     A substantial controversy exists between the Hospital and PCH Lab #1 as to whether the Reference Lab Agreement and/or the operation of a reference laboratory or laboratories violates healthcare laws or regulations.

98.     A substantial controversy exists between the Hospital and PCH Lab #1 as to whether the Reference Lab Agreement and/or the operation of a reference laboratory or laboratories violate the Newman's agreements with third party payors.

99.     The controversy between Newman and PCH Lab #1 regarding the Reference Lab Agreement is definite and concrete.

100.    The controversy between Newman and PCH Lab #1 concerns legal relations between Newman and PCH Lab #1 and each party has interests adverse to the other.

101.    The controversy between Newman and PCH Lab #1 is real and substantial so as to be capable of a decision granting or denying specific relief of a conclusive nature.

102.    The Court has authority to declare the rights and obligations of Newman and PCH Lab #1 with respect to the Reference Lab Agreement pursuant to Okla. Stat. tit. 12 § 1651.

## COUNT VIII: THE EXPANDED FACILITY LAB AGREEMENT

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred and two (102), and further allege as follows:

103.    A substantial controversy exists between Newman and PCH Lab #2 as to whether PCH Lab #2 is a valid legal entity registered to do business in Oklahoma.

104.    A substantial controversy exists between Newman and PCH Lab #2 as to whether PCH Lab #2 has performed any of the required duties under the Expanded Facility Lab Agreement.

105.    A substantial controversy exists between Newman and PCH Lab #2 as to whether PCH Lab #2 should return any fee received under the Expanded Facility Lab Agreement to the Hospital.

106.    A substantial controversy exists between Newman and PCH Lab #2 as to whether the early termination fee is a penalty provision which is unenforceable.

107.    The controversy between Newman and PCH Lab #2 concerning the Expanded Facility Lab Agreement is definite and concrete.

108.    The controversy between Newman and PCH Lab #2 concerns legal relations between the Hospital and PCH Lab #2 and each party has interests adverse to the other.

109.    The controversy between Newman and PCH Lab #2 is real and substantial so as to be capable of a decision granting or denying specific relief of a conclusive nature.

110.    The Court has authority to declare the rights and obligations of Newman and PCH Lab #2 with respect to the Expanded Facility Lab Agreement pursuant to Okla. Stat. tit. 12 § 1651.

## COUNT IX: BREACH OF CONTRACT – PCH-Hospital Agreement

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred ten (110), and further allege as follows:

111.    By failing to provide adequate and necessary EMR system, PCH has breached the Hospital Agreement by failing, among other issues, to submit timely bills for in-patient services.

112.    As a result, Newman and the Authority will not be able to collect from patient and/or payors for all services provided.  This is a breach of Hospital Agreement.

18

113.    By failing to adequately and timely pay Newman's trade accounts as required by the Hospital Agreement, PCH has subjected the Plaintiffs to collection actions and impeded their ability to obtain necessary services for the Hospital.

114.    As a result of PCH's business practices, the Newman's contracts with payors are in jeopardy. This is a breach of the Hospital Agreement.

115.    Further, as a result of PCH's business practices, the Newman and the Authority are subject to time and expense of payor fraud investigations and audits in breach of Hospital Agreement.

116.    Further, as a result of PCH's business practices, Newman has entered into numerous unnecessary contracts to provide the same services for additional fees in breach of the Hospital Agreement and/or PCH's fiduciary responsibility to perform in the best interest of the Hospital.

117.    As a result of these breaches by PCH, Newman and the Authority have been damaged in excess of $75,000.

118.    As the Hospital Agreement is an agreement for goods and services, the Hospital is entitled to the recovery of attorney's fees under 12 Okla. Stat. § 936 for the breach of this Agreement.

## COUNT X: BREACH OF FIDUCIARY DUTY- PCH

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred eighteen (118), and further allege as follows:

119.    As manager of the Hospital under the Hospital Agreement, PCH owed Newman and the Authority certain fiduciary duties of loyalty, due care, good faith, candor, and full disclosure.

19

120. The Hospital Agreement created an agency relationship between PCH and Newman and the Authority such that PCH owed Newman and the Authority certain fiduciary obligations to act for the benefit of Newman and in its best interest.

121. PCH breached its fiduciary duties and/or obligation to act loyally and in good faith with a view toward the best interest of Newman while exercising its powers and discharging its duties under the Hospital Agreement, as well as its failure to exercise its duties to oversee billing and the relationship with the private medical insurance companies ("Payors") with whom the Hospital has contractual relationships and obligations.

122. PCH breached its fiduciary duty by failing to exercise the care, diligence, and skill that a reasonably prudent manager would exercise under similar circumstances.

123. PCH breached its fiduciary duty by failing to manage Newman and ensure that proper and timely billing of services were provided to patients and Payors.

124. PCH breached its fiduciary duties by billing for services that are not appropriate or allowable under the contracts between Newman and Payors and by not timely providing the Hospital with notice that bills had been disputed or not paid.

125. As a proximate cause of the breach of fiduciary duties, Newman and the Authority have suffered damages in excess of $75,000.

## COUNT XI: BREACH OF CONTRACT- Sun and Mission

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred twenty-five (125), and further allege as follows:

126. Newman entered into a contract with Sun and into a contract with Mission on or about April 20, 2016.

127. Both the Sun Contract and the Mission Contract state that neither Sun nor Mission will do anything to adversely affect Newman's ability to participate in private medical insurance or payment program.

128. Sun and Mission have facilitated laboratory programs and accessioning services upon behalf of the Hospital which have adversely affected and jeopardized Newman's contracts with Payors and have subjected the Hospital to liability from Payors.

129. Both Sun and Mission have breached the contracts with Newman.

130. As a result, Newman has suffered damaged from Sun's breach of contract in excess of $75,000 and from Mission's breach of contract in excess of $75,000.

## COUNT XII: BREACH OF CONTRACT- Integrity

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred thirty (130), and further allege as follows:

131. Newman entered into a contract with Integrity on or about May 27, 2016.

132. The Integrity Contract states that Integrity will, in the performance of its duties, "comply with all applicable laws and regulations, including but not limited to, laws and regulations (and government interpretations thereof) relating to billing, coding, and submission of clams for federal, state and third party payors."

133. Integrity has facilitated billing for the Lab Program and accessioning services upon behalf of Newman which have adversely affected and jeopardized the Newman's contracts with Payors and have subjected Newman to liability from Payors.

134. Both Sun and Mission have breached the contracts with Newman.

135. As a result, Newman has suffered damaged from Sun's breach of contract in excess of $75,000 and from Mission's breach of contract in excess of $75,000.

21

## COUNT XIII: DECLARATORY JUDGMENT- CEASE AND DESIST –PCH Defendants,

## Reference Lab Defendants, and Cornerstone

Newman and the Authority incorporates each and every allegation of fact or claim set forth in paragraph one (1) through one hundred thirty-five (135), and further allege as follows:

136.    The PCH Defendants', Reference Lab Defendants', and Cornerstone's actions are fraudulent, illegal, and lack good morals.

137.    Newman seeks to enjoin the PCH Defendants, Reference Lab Defendants, and Cornerstone from using Newman's national provider identifier number, CLIA Certification, and submitting claims to any private or federal payors, including, but not limited to: Aetna, BlueCross BlueShield, Cigna, Humana, United Healthcare, Medicaid and Medicare on behalf of Newman.

138.    Newman requests that a temporary injunction be issued, without notice to the PCH Defendants, Reference Lab Defendants and Cornerstone, to prevent immediate and irreparable harm to Newman. The standard for a temporary injection is as follows, the plaintiff must show: (1) the plaintiff has a substantial likelihood of prevailing on the merits; (2) the plaintiff will suffer irreparable injury in the absence of a temporary injunction; (3) the relative effect on other interested parties if the relief is granted; and (4) public interest. *See, e.g., Daffin v. State of Oklahoma ex rel. Oklahoma Dept. of Mines*, 2011 OK 22, ¶ 2, 251 P.3d 741. This standard has been met, as:

a.    Newman and the Authority are likely to succeed on the merits, because PCH's contract is unlawful and, thus, contracts that were entered into by PCH on Newman's behalf were unauthorized, and are void and unenforceable; the PCH Defendants and Reference Lab Defendants have breached their contracts with Newman and/or the Authority; and PCH

22

Defendants', Reference Lab Defendants', and Cornerstone's actions are fraudulent, illegal, and lack good morals;

        b.      PCH Defendants, Reference Lab Defendants, and Cornerstone have caused Newman and the Authority immediate and irreparable harm, as audits have been requested and private payers have threatened and/or terminated their contracts with Newman and the Authority;

        c.      The private payers as well as the federal payers will be benefited from the enjoined submission of fraudulent claims; and

        d.      The payers, private and federal, are financially supported by the public at large. Therefore, the public's interest will be served by enjoining fraudulent submissions of claims to payers.

      139.    Newman also seeks to enjoin PCH from:

        a.      Accessing accounts of Newman;

        b.      Accessing Newman whether in-person or remotely;

        c.      Accessing the medical records, billing records, claims records, including any and all other records of Newman;

        d.      Using Newman's national provider identifier number or making any claims to any private insurance carrier, federal insurance program, or any other entity which purport to be related to services provided by or on behalf of Newman;

        e.      Using Newman's CLIA Certification; and

        f.      All duties of PCH as set forth in Section 2 of the Hospital Agreement.

      140.    Newman requests that a temporary injunction be issued, without notice to PCH. The standard for temporary injunctive relief has been met, as:

a.     Newman and the Authority are likely to succeed on the merits, because PCH's contract is unlawful and, thus, void and unenforceable; PCH has breached their contract with Newman and the Authority; and PCH's actions are fraudulent, illegal, and lack good morals;

b.     PCH has caused Newman and the Authority immediate and irreparable harm, as audits have been requested and private payers have threatened and/or terminated their contracts with Newman and the Authority, and the Internal Revenue Service has requested an audit;

c.     The community of Shattuck, Oklahoma will be benefited by preventing municipal funds from supporting PCH's unlawful endeavors, and medical patients will be benefited by restricting access to their medical records; and

d.     The public's interest will be served by protecting confidential information and preventing further fraudulent actions.

141.    Accordingly, Newman and the Authority request and are entitled to injunctive relief against PCH Defendants, Reference Lab Defendants, and Cornerstone temporarily restraining, temporarily enjoining, and permanently enjoining them from the activities listed in Paragraphs 137 and 139(a)-(f).

## COUNT XIV: DECLARATORY JUDGMENT- Shattuck National Bank

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred forty-one (141), and further allege as follows:

142.    Defendant Shattuck National Bank, N.A., ("SNB") has a first lien on all of Newman's accounts and contract rights, equipment, general intangibles, inventory and all accounts and contract rights.

24

143.    SNB is in possession and control of certain financial accounts of Newman's, which PCH Defendants and Reference Lab Defendants have claimed some right, title, or interest in and to certain monies contained therein.

144.    PCH may claim some right, title, or interest in and to certain equipment owned and maintained by Newman in which SNB has a lien on.

145.    Therefore, SNB has an interest in the subject matter of this action and should appear herein to assert its rights and priority between it and PCH.

146.    As a result, Newman asks this Court to examine the contracts between the parties and the dealing between the parties before and after the execution of the contracts, including the liens referenced herein, to determine whether any sums are owed by Newman to PCH Defendants and/or Reference Lab Defendants, and if so, how much.

### COUNT XV: ACCOUNTING- PCH, PCH LAB #1, Integrity, and Cornerstone

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred forty-six (146), and further allege as follows:

147.    Upon information and belief, Defendants PCH, PCH Lab #1, Integrity, and Cornerstone have subjected Newman to liability for laboratory claims which were not performed in Newman's laboratory and for which no payment has been received or for which the Hospital has received no benefit.

148.    Defendants PCH, PCH Lab #1, Integrity, and Cornerstone have received and used funds from the Hospital for which Newman is subject to liability due to the Lab Program's potential violation of Payor contracts.

149.    Due to the access of Defendants PCH, PCH Lab #1, Integrity, and Cornerstone to and control over the information concerning billings, claims and finances of Newman, Newman is

25

in need of a full accounting by Defendants PCH, PCH Lab #1, Integrity, and Cornerstone in order to accurately determine the location of such funds, billings, and claim, the application of such funds, the application of all monies paid by Newman to the Defendants PCH, PCH Lab #1, Integrity, and Cornerstone and the extent of the Newman's damages.

150. Newman requests that this Court enter an order for an accounting of Newman's financial records and PCH, PCH's Lab #1, Integrity, and Cornerstone's financial records as it relates to services provided to Newman.

## COUNT XVI: FRAUDULENT TRANSFERS

Newman and the Authority incorporate each and every allegation of fact or claim set forth in paragraph one (1) through one hundred fifty (150), and further allege as follows:

151. On information and belief, the PCH Defendants and Reference Lab Defendants have made transfers of property to property to various defendants and unknown others with actual intent to defraud Newman and/or others with respect to the allegations and schemes set forth herein without receiving equivalent value in exchange for the transfer.

152. Pursuant to the Uniform Fraudulent Transfer Act, 24 O.S. § 112, *et seq.*, Plaintiffs are entitled to avoidance of these transfers.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Enter an Order that the Hospital Agreement is void and unenforceable as a matter of law, that PCH, therefore, had no authority to enter agreements on Newman's behalf, and that any such agreements entered into by PCH are null and void;

b. Find that PCH committed fraud in inducing the Hospital to enter the Hospital Agreement, and that PCH is liable for all damages relative to that contract and that the contract is void owing to the fraud;

c. Find that the PCH Defendants and Reference Lab Defendants committed fraud and conspired to commit fraud and other illegal actions on the Plaintiffs;

d. Find that the PCH Defendants and Reference Lab Defendants have committed tortious interference with Plaintiffs' existing contracts;

e.      Enter orders establishing the rights and obligations under the Hospital Agreement, the Reference Lab Agreement and the Expanded Facility Lab Agreement and that that Newman owes Defendants nothing under the contracts;

f.      Find that PCH breach its contract with and its fiduciary duty to Plaintiffs;

g.      Find that Sun and Mission have breached their contracts with Plaintiff;

h.      Find that Integrity breached its contract with Plaintiffs;

i.      Enter an order prohibiting the PCH Defendants, Reference Lab Defendants and Cornerstone from accessing Newman's accounts, property, records; using Newman's national provider number or CLIA certification; making any claims or billing any private insurance carrier, federal insurance program, or other entity on behalf of Newman or for services alleged to be provided by Newman;

j.      Enter an order determining the rights of Shattuck National Bank to determine their rights as to any funds relative to the parties, contracts or funds at issue;

k.      Enter an order for an accounting of Hospital's financial records and PCH, PCH's Lab #1, Integrity, and Cornerstone's financial records as it relates to services provided to Newman;

l.      Determine whether and to what extent transfers made by the PCH Defendants and Reference Lab Defendants to other defendant have been made and to what extent such defendants are liable for those transfers

and find that the Defendants are jointly and severally, for compensatory damages in excess of $75,000 to Plaintiffs and punitive damages, costs, attorney's fees, and such other relief as the court finds just and equitable under the circumstances.

**ATTORNEYS LIEN CLAIMED**

**JURY TRIAL DEMANDED**

Respectfully submitted,

*Brock Z. Pittman*

J. Clay Christensen, OBA No. 11789
Jeffrey E. Tate, OBA No. 17150
Brock Z. Pittman, OBA No. 32853
Christensen Law Group
The Parkway Building
3401 NW 63rd Street, suite 600
Oklahoma City, OK 73116
Telephone: (405) 232-2030
Facsimile: (405) 236-1012
Clay@christensenlawgroup.com
Jeffrey@christensenlawgroup.com
Brock@christensenlawgroup.com

and

A. Michelle Campney, OBA No. 12990
Mary H. Richard, OBA No. 7550
Candace Lisle, OBA No. 9638
PHILLIPS MURRAH P.C.
Corporate Tower, Thirteenth Floor
101 North Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-4100
Facsimile: (405) 235-4133
Email: amcampney@phillipsmurrah.com

**ATTORNEYS FOR PLAINTIFFS**