# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AETNA INC. and AETNA LIFE INSURANCE    )
COMPANY,    )
    )
    Plaintiffs,    )
    )
v.    )    No. _____
    )
THE PEOPLE'S CHOICE HOSPITAL, LLC; PCH    )
MANAGEMENT NEWMAN, LLC; PCH LAB    )
SERVICES, LLC; PCH LABS, INC.; MISSION    )
TOXICOLOGY, LLC; MISSION TOXICOLOGY II,    )
LLC; MISSION TOXICOLOGY MANAGEMENT    )
COMPANY, LLC; SUN CLINICAL LABORATORY,    )
LLC; SUN ANCILLARY MANAGEMENT, LLC;    )
INTEGRITY ANCILLARY MANAGEMENT, LLC;    )
SETH GUTERMAN, MD; DAVID WANGER;    )
MICHAEL L. MURPHY, M.D.;    )
and JESSE SAUCEDO, JR.,    )
    )
    Defendants.    )

## COMPLAINT

For their Complaint, Plaintiffs Aetna Inc. and Aetna Life Insurance Company (together, "Aetna") allege the following:

## NATURE OF THE ACTION

1. Defendants engaged in an extensive health care billing fraud scheme through which they bilked Aetna, employers that sponsor health plans, and Aetna members out of more than $21 million. In 2016, Defendants acquired control of Newman Memorial Hospital ("Newman"), a rural hospital in Oklahoma that has a contract with Aetna and is part of Aetna's network, and thereafter conducted Newman's business through a continuous pattern of mail and wire fraud. Defendants used the Newman enterprise as a vehicle to disguise fraudulent health care claim forms, which misrepresented that laboratory testing services were performed *by and*

EXHIBIT

1

*at Newman*, when in truth, the services were not. Indeed, Defendants completed, or caused to be completed, the laboratory tests at issue for patients from around the country, including here in Pennsylvania, who had no contact at all with Newman or its physicians. Then, Defendants fraudulently submitted claim forms to Aetna misrepresenting that the tests had been performed at Newman, by Newman, and for Newman patients.

2. Defendants targeted Newman as an enterprise through which they perpetrated their fraudulent scheme, and did so also through an association-in-fact enterprise. Defendants exploited the fact that Aetna has a network contract with Newman that requires Aetna to pay Newman significantly more for lab services provided at and by the hospital, than Aetna would normally pay for claims submitted directly by the laboratories that actually performed the services and that are not part of Aetna's network. The Defendants disguised these out-of-network labs within their association as "Newman" in claims submissions, so as to fraudulently induce Aetna to pay the higher "Newman" contract rate based on the repeated misrepresentation that the laboratory tests had been performed by and at Newman. Defendants thereby submitted or caused the submission of more than 10,000 false claim forms, which induced Aetna to pay millions of dollars at the Newman network contract rate.

3. Through this fraud in conducting and participating in the affairs of the Newman enterprise and their association-in-fact enterprise, Defendants generated more than $21 million in payments from Aetna over the course of at least sixteen (16) months. Defendants funneled these monies through Newman and diverted the funds to themselves, leaving Newman teetering on the brink of insolvency. The extraordinary increase of Aetna's payments to Newman after Defendants acquired control over the enterprise confirms the success of their fraud: Aetna paid Newman on average only less than $1,300 per month for 72 lab claims performed the year before

Defendants acquired control over Newman; then, after Defendants took control of the Newman enterprise, Aetna paid Newman approximately $1.35 million per month—all or most of which Defendants took for themselves—for more than 10,000 lab claims during a 16-month period until they were caught.

4.      In violation of 18 U.S.C. § 1962(c) and (d), Defendants conducted and participated in the affairs of the Newman enterprise and their association-in-fact enterprise, and conspired among themselves and others to do so, through a pattern of mail and wire frauds.   By reason of this conduct, Aetna (including the employers and employees contributing to the health plans) sustained damages exceeding $21 million.   In addition to violating these federal laws, Defendants' conduct and conspiracy constitutes fraud and misrepresentation under applicable state law, based on the misrepresentations that the lab services at issue were performed and processed by and at Newman, when in fact, they were not.   Pursuant to contracts that certain Defendants caused Newman to enter with other Defendants operating the labs, those labs received at least 60-70% of the money that Aetna paid Newman as a result of the fraudulent claims, while the large part of the remainder was divvied up among the other Defendants. Defendants' conduct also constitutes tortious interference with the contract between Aetna and Newman, as well as tortious interference with the contracts between Aetna and its network physicians who the Defendants caused or otherwise induced to refer services to the Defendant labs.   Further, Defendants are liable to Aetna on claims for unjust enrichment, equitable accounting and money had and received, as well as for injunctive relief.

## THE PARTIES

### Plaintiffs

5.      Plaintiff, Aetna Inc., is a Pennsylvania corporation with its principal place of business in Connecticut and with a substantial business operation in Blue Bell, Pennsylvania. Aetna Inc., through its affiliated companies, provides health insurance and administrative services for self-funded medical benefits plans throughout the United States.

6.      Plaintiff Aetna Life Insurance Company ("ALIC"), one of Aetna Inc.'s affiliates, is a healthcare insurer organized under the laws of Connecticut with a principal place of business in Connecticut.  ALIC provides health insurance and administrative services for self-funded medical benefits plans throughout the United States.

### The PCH Defendants

7.      The People's Choice Hospital, LLC ("People's Choice") is a Delaware limited liability company that maintains a business address at 820 W. Newport #3T, Chicago, Illinois 60657.  Seth Guterman is the sole member and manager of People's Choice, which can be served with process through its registered agent, Matt Yeterian, at 2000 Spring Rd., Suite 200, Oak Brook, Illinois 60652.

8.      PCH Management Newman, LLC ("PCH Management") is an Oklahoma limited liability company.  PCH Management can be served with process through its registered agent, Registered Agents Inc., at 3030 Northwest Expressway, Suite 2008, Oklahoma City, Oklahoma 73112.

9.      PCH Lab Services, LLC ("PCH Lab #1") is an Illinois limited liability company that maintains a business address at 1200 Harger Rd., Suite 308, Oak Brook, Illinois 60523.

4

PCH Lab #1 can be served with process through its registered agent, Goldstein & McClintock LLLP, at 208 S. LaSalle St., Suite 1750, Chicago, Illinois 60604.

10.     PCH Labs, Inc. ("PCH Lab #2") is a Delaware corporation, and upon information and belief, maintains its principal place of business in Delaware.  PCH Lab #2 can be served with process through the Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, Delaware 19801.

### **The Lab Defendants**

11.     Mission Toxicology, LLC ("Mission I") is a Texas limited liability company that maintains a business address at 2145 NW Military HW, Suite 102, San Antonio, Texas 78230. Mission I can be served with process through its registered agent, Jesse Saucedo Jr., at 1018 Solitude Cove, San Antonio, Texas 78260.

12.     Mission Toxicology II, LLC ("Mission II") is a Texas limited liability company that maintains a business address at 1018 Solitude Cove, San Antonio, Texas 78260.  Mission II can be served with process through its registered agent, Jesse Saucedo Jr., at 1018 Solitude Cove, San Antonio, Texas 78260.

13.     Mission Toxicology Management Company, LLC ("Mission Management") is a Texas limited liability company that maintains a business address at 2145 NW Military HW, Ste. 102, San Antonio, Texas 78230.  Mission Management can be served with process through its registered agent, Jesse Saucedo Jr., at 1018 Solitude Cove, San Antonio, Texas 78260.

14.     Mission I, Mission II and Mission Management are collectively referred to herein as "Mission Defendants").

15.     Sun Clinical Laboratory, LLC ("Sun Lab") Sun is a Texas limited liability company that maintains a business address at 7 Champions Lane, San Antonio, Texas 78257.

Sun Laboratory can be served with process on its registered agent, Michael L. Murphy, at 7373 Broadway, Ste. 507, San Antonio, Texas 78209.

16.     Sun Ancillary Management, LLC ("Sun Management") is a Texas limited liability company that maintains a business address at 45 NE Loop 410, Suite 215, San Antonio, TX 78216.  Sun Management can be served with process through its registered agent, Michael L. Murphy, at 7373 Broadway, Ste. 507, San Antonio, Texas 78209.

17.     Sun Lab and Sun Management are collectively referred to herein as "Sun Defendants").

18.     Integrity Ancillary Management, LLC ("Integrity") is a Texas limited liability company that maintains a business address at 7373 Broadway, Ste. 507, San Antonio, Texas 78209.  Integrity can be served with process through its registered agent, Michael L. Murphy, at 7373 Broadway, Ste. 507, San Antonio, Texas 78209.

19.     The Mission Defendants, the Sun Defendants, and Integrity are collectively referred to herein as "Lab Defendants".

## The Individual Defendants

20.     Seth Guterman, M.D. ("Guterman") is an individual domiciled in Illinois, and he serves as the President of People's Choice.  Guterman can be served with process at 820 W. Newport Ave., Floor 1, Chicago, Illinois 60657.

21.     David Wanger ("Wanger") is an individual domiciled in Arizona, and he serves as the interim CEO of Newman Memorial Hospital, a position to which Wanger was appointed by PCH.  Wanger can be served with process at 9411 E. Jasmine Circle, Mesa, Arizona 85207.

22.     Michael L. Murphy, M.D. ("Murphy") is an individual domiciled in Texas, and he serves as a principal for the Sun Defendants and Integrity.  Murphy can be served with process at

505 E. Mandalay Dr., 1703, San Antonio, Texas 78212. Murphy can also be served with process at any of the business addresses referenced herein in which he serves as the registered agent.

23. Jesse Saucedo, Jr. ("Saucedo") is an individual domiciled in Texas, and serves as the founding partner of Integrity and as a principal of the Mission Defendants. Saucedo can be served with process at 1018 Solitude Cove, San Antonio, Texas 78260. Saucedo can also be served with process at any of the business addresses referenced herein in which he serves as the registered agent.

24. Guterman, Wanger, Murphy, and Saucedo are collectively referred to herein as "Individual Defendants").

## JURISDICTION AND VENUE

25. The Court has subject matter jurisdiction over this action pursuant to the following:

(a) 18 U.S.C. §1964(c) and 28 U.S.C. §1331, because Plaintiffs bring claims arising under the Constitution, laws, or treaties of the United States, specifically, 18 U.S.C. § 1964 ("Civil Remedies"); and

(b) 28 U.S.C § 1332, because the matter in controversy exceeds the sum or value $75,000, exclusive of interest and costs, and is between citizens of different States. Plaintiff Aetna Inc. is a citizen of Pennsylvania and Connecticut and Plaintiff Aetna Life Insurance Company is a citizen of Connecticut. After diligent investigation of public databases, civil dockets, and the secretary of state websites for the states of Texas, Delaware, Illinois, and Oklahoma, and to the best of Aetna's knowledge, each Defendant is a citizen of a state other than Connecticut or Pennsylvania.

26. The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

27. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

28.     Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction with respect to this action.

29.     Defendants have submitted to the personal jurisdiction of this court because they have purposefully directed their fraudulent scheme and other activities at Aetna, Aetna members, and employees whose health plans Aetna administers who reside and are domiciled in this forum and because Aetna's claims arise out of Defendants' fraudulent schemes and other activities in this forum. *See* 42 Pa. C.S. §5322(a)(4). By doing business in this forum and by knowingly directing their fraudulent scheme and conducting other activities towards Aetna, Aetna members, and employers and employees whose health plans Aetna administers who reside and are domiciled in this forum, Defendants have purposefully availed themselves of the privilege and opportunity of conducting business in Pennsylvania.

30.     Alternatively and in addition, this Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965 as this Court, at a minimum, has personal jurisdiction over the Mission Defendants, the Sun Defendants, and Integrity, and the remaining Defendants are based in, and have minimum contacts with, the United States, and no single district court would have personal jurisdiction over all of the co-conspirator Defendants.

## FACTUAL ALLEGATIONS

### Summary of the Scheme

31.     The PCH Defendants gained control of the financially-vulnerable Newman in 2016 by promising to revamp the hospital and by convincing Newman to sign a management agreement with People's Choice and PCH Management. But helping Newman and improving its operations were the least of the PCH Defendants' concerns.

32. Upon gaining control of Newman, People's Choice and PCH Management caused Newman to enter into agreements with the Lab Defendants, PCH Lab #1 and PCH Lab #2, who conspired with People's Choice, PCH Management and the Individual Defendants to defraud Aetna and employers and employees whose health plans Aetna administers.

33. The Lab Defendants paid and induced physicians all over the country to send urine and blood specimens to the Lab Defendants. Defendants had these physicians inform the patients that their specimens would be sent to, tested, and processed by the Lab Defendants.

34. Nevertheless, after the specimens were sent to and tested by the Lab Defendants, Defendants misrepresented to Aetna that the specimens were tested by and at Newman, thus causing Aetna and employers whose health plans Aetna administers to pay millions of dollars to Newman, which PCH controlled. Defendants billed the laboratory claims as if they were completed at Newman because Newman has a contract with Aetna that contains high reimbursement rates for lab services performed by and at Newman.

35. The following example demonstrates how Defendants' fraudulent billing scheme operates in practice. A physician informed Aetna Member No. 1 that the urine sample the physician collected from Aetna Member No. 1 in Jacksonville, Florida would be sent to San Antonio, Texas for testing and processing by Sun Clinical Laboratory, LLC. While Aetna Member No. 1's sample was sent to and tested by Sun Clinical Laboratory, LLC, Defendants submitted a claim form to Aetna for Aetna Member No. 1 misrepresenting that Aetna Member No. 1's specimen was tested by and at Newman. Defendants' misrepresentations were explicit, as confirmed by the following image of the actual bill—commonly known as a "UB-04" claim form—Defendants submitted to Aetna for Aetna Member No. 1, which identifies Newman as the provider of lab services that were actually provided by Sun Clinical Laboratory, LLC:

```
SRV PRV NEWMAN MEMORIAL HOSPITAL        BLL PRV NEWMAN MEMORIAL HOSPITAL
ADDR1 905 SOUTH MAIN           REG      ADDR1 905 SOUTH MAIN
ADDR2                                   ADDR2
CITY SHATTUCK          ST OK ZIP 73858  CITY SHATTUCK          ST OK ZIP 73858
TEL           PIN PO6470635 OAE         TEL 5203706601   TIN TJXXXXX0773
```

36.     As a result of Defendants' fraudulent claim, Aetna paid Newman $2,250, which was split up and distributed among various Defendants. By comparison, if a large legitimate laboratory company with a national presence submitted a claim to Aetna for the same services Defendants billed Aetna for Aetna Member No. 1, the legitimate lab company would have received and accepted approximately $120.

37.     Defendants reaped millions of dollars in ill-gotten gains by repeating this process thousands of times at Newman and at other Aetna-affiliated facilities throughout the country. In each instance, Defendants submitted claim forms to Aetna that misrepresented that the lab services at issue were performed by and at Newman, even though Defendants knew that was not the case.

38.     Defendants disguised themselves as Newman because Aetna's contract with the hospital requires Aetna to pay significantly more for hospital-based laboratory claims submitted by Newman than Aetna would pay for claims submitted by laboratories that are not part of Aetna's network. Aetna agreed to pay higher rates to Newman in order to ensure that Aetna members *in rural Oklahoma* had access to quality healthcare, but Defendants perverted this access arrangement to line their pockets with ill-gotten gains.

39.     As part of their fraudulent scheme, Defendants paid physicians to send the Lab Defendants specimens from Aetna members in places like Pennsylvania who never visited or formed any connection with Newman, and submitted claims for payment misrepresenting that the specimens were analyzed by and at Newman in Shattuck, Oklahoma.

40.     Many of these specimens came from members living in the Eastern District of Pennsylvania who are covered by employer-provided health plans administered by Aetna, including plans covering employees of the Central Bucks School District, the Plumbers Local Union, the Bensalem County School District, and the Bristol County School District.  In total, Defendants submitted at least 114 fraudulent claim forms to Aetna misrepresenting that Newman analyzed Pennsylvania members' specimens, defrauding Aetna and Pennsylvania-based employers whose health plans Aetna administers out of at least $231,000.

41.     Not only did Defendants conspire to submit to Aetna numerous fraudulent billing claim forms, but PCH's President and Newman's interim CEO (who PCH installed) also sent letters and emails to Aetna that were replete with blatant misrepresentations designed to mask and cover-up Defendants' fraudulent billing scheme.  By way of example, the PCH-appointed interim CEO of Newman misrepresented to Aetna in September 2016 that Newman is "extensively involved in processing these urine specimens."  Similarly, PCH's CEO emailed Aetna in April 2017 and misrepresented that Defendants billed only for "legitimate medical services that were analyzed on [Newman] hospital property."

42.     PCH's President also sent Aetna phony pictures purporting to depict the supposed lab on Newman's premises where the services at issue were supposedly performed.  This was a blatant misrepresentation.

43.     In reliance on Defendants' many fraudulent misrepresentations that the lab services billed for were performed and processed by and at Newman, Aetna remitted more than $21 million to Newman during the period when the hospital was under the PCH Defendants' control.

44.     Pursuant to contracts that the PCH Defendants caused Newman to enter with certain Lab Defendants, 60-70% of the money Aetna paid Newman as a result of Defendants' fraudulent bills were funneled to those Lab Defendants.  The majority of the remainder of the money was divvied up among the other Defendants.

## Aetna's Network

45.     Aetna brings this action on its own behalf as the provider of fully-insured health plans through which individuals, employees and employers pay Aetna premiums in exchange for Aetna agreeing to pay their healthcare claims using Aetna's money.

46.     Aetna also brings this action as claims administrator for self-funded, employer-established health plans that retain Aetna as a third-party administrator to process employees' healthcare claims and pay those claims out of a pool of money comprised of funds contributed by employers and their employees.  For these self-funded health plans, Aetna does not underwrite or insure the benefits being paid.  Rather, claims covered under self-funded health plans are paid directly by employers and employees using their own money.

47.     Individuals who are covered by health plans provided and administered by Aetna are referred to as "members."

48.     Through its fully-insured and self-funded health plans, Aetna provides access to coverage and benefits for its members pursuant to a variety of healthcare benefit plans and policies of insurance, including: (i) self-funded plans for which Aetna provides various third-party claims administrative services; (ii) fully-insured group policies issued by Aetna that are established and maintained by private employers to provide coverage to employees; (iii) plans covering federal employees; (iv) plans covering employees of state governmental entities; (v) church plans; (vi) policies issued to individuals; and (vii) Medicare.

49.     Health benefit plans provided and administered by Aetna include covered benefits for "in-network" services, which are services provided by medical providers contracted with Aetna (including affiliates, such as Aetna Healthcare, Inc., discussed below).

50.     When an in-network provider, such as Newman, submits a claim for payment to Aetna, Aetna is contractually obligated to issue payment, which the provider is contractually obligated to accept, at the contracted rate negotiated between Aetna and the provider.

51.     By comparison, Aetna is not necessarily obligated to pay claims submitted by non-participating providers, such as the Lab Defendants.  Instead, Aetna is only typically obligated to issue payment to non-participating providers for covered services where the member's health plan includes out-of-network benefits.  Whether a member's plan includes out-of-network benefits is determined by the member or his or her employer.  Also, where a member's plan provides out-of-network benefits, the benefits available for such services are often limited.  Further, a member who receives medical services from a non-participating provider is typically required to pay for a larger share of the costs than the patient would be required to pay for services rendered by a participating provider.

52.     Non-participating providers are also subject to additional administrative reviews and scrutiny for appropriateness of the services and amounts they are charging members, and in many instances must obtain precertification from Aetna prior to rendering services and submitting bills for same in order to receive payment.

53.     Because of the typical terms of health plans and the need to review and scrutinize "out-of-network" (or, "non-participating") provider activities and billings to members, it is more difficult for non-participating providers, like the Lab Defendants, to legitimately promote

themselves to and attract Aetna members, and to legitimately receive reimbursement from Aetna, than it is for "in-network" (or, "participating") providers like Newman.

54.     Defendants recognized this fact, and they devised a fraudulent scheme using Newman as the vehicle to misrepresent Defendants' services as being provided by and at a participating provider in order to induce Aetna into paying them (through Newman) the high reimbursement rates Aetna is contractually obligated to pay Newman for lab services that Newman performed at the hospital.

### Aetna's Contractual Relationship with Newman

55.     In 2000, Aetna U.S. Healthcare, Inc. entered into an agreement with Newman whereby Newman became a participating provider with Aetna U.S. Healthcare, Inc. and all of Aetna's affiliated companies, including Plaintiffs (the "Contract").

56.     As with other in-network providers, Aetna remits payment to Newman when Aetna receives a claim form bearing Newman's name and billing information, which is only to be used for medical services provided by and at Newman for Aetna members who were Newman patients.

57.     The Contract also prohibits Newman from disclosing the contents of the Contract or any information developed by or belonging to Aetna, including its rates and procedures.

58.     The amount Aetna pays for a claim submitted using Newman's name and billing information is typically significantly higher than Aetna's payment would be for the same claim submitted by others labs (both in-network and out-of-network) using their respective names and billing information (the amount Aetna pays for claims submitted under Newman's name and billing information is hereinafter referred to as the "Reimbursement Rate").

59. Aetna reimburses Newman (and other rural hospitals) at a higher rate to ensure that Aetna members in rural parts of America with few medical facilities have access to high-level healthcare providers whose quality and credentials are vetted by Aetna. In many instances, the rural hospital is the only accessible source of medical care for patients insured through Aetna, and therefore, the reimbursement rates are higher in such markets.

60. Newman is located in Shattuck, Oklahoma, a town with less than 2,000 residents. Newman has, therefore, typically submitted a relatively small amount of claims to Aetna. Between 2013 and 2015, for example, Aetna paid Newman an average of $91,000 annually.

61. After Defendants acquired control and conducted Newman's affairs starting in 2016 and into 2017, the amount of claims Newman submitted to Aetna increased exponentially, jumping from an average of 6 lab claims monthly to 834 lab claims per month. Between January 2016 and April 2017, the claims Defendants submitted to Aetna on behalf of Newman caused Aetna to pay Newman at least $21,625,688, the vast majority of which was funneled to and among the Defendants.

**The Defendants' Relationships**

62. In 2016, when Newman was vulnerable and struggling financially, People's Choice met with Newman and promised that if Newman agreed to let People's Choice and PCH Management manage the hospital, they would overhaul Newman's operations and save it.

63. Based on these promises, Newman entered into a management agreement with People's Choice, through People's Choice's subsidiary, PCH Management, as well as other agreements with the PCH Defendants. Through this arrangement, the PCH Defendants acquired complete control over the management, operations, and finances of the Newman enterprise, and

they caused Newman to enter into purported lab management contacts with PCH Lab #1 and PCH Lab #2 which required Newman to pay significant fees to these Defendant entities.

64.     The PCH Defendants intended to, and did, use their control over the Newman enterprise to exploit the hospital as a vehicle and conduit to funnel money from health insurers to themselves and the other Defendants.

65.     Shortly after taking over Newman, People's Choice also caused Newman to enter into a series of contracts with the Lab Defendants, which own, operate, and control laboratories that perform diagnostic services in urine toxicology, pharmacogenetics, and hematology testing, as well as companies that provide billing and ancillary services for laboratories.

66.     Specifically, the PCH Defendants caused Newman to sign a contract with the Sun Defendants and the Mission Defendants.  Under this contract, the Sun and Mission Defendants received 70% of the monthly revenues not exceeding $4 million that Newman received from Aetna and other insurers for lab-related services, and 60% of such revenues exceeding $4 million.

67.     The PCH Defendants also caused Newman to sign a contract with Integrity, a billing company that submits bills and payment appeals to Aetna on behalf of the Lab Defendants.  Pursuant to the contract PCH caused Newman to enter with the company, Integrity received a portion of the money Aetna paid Newman in connection with the Defendants' fraudulent lab scheme.

68.     Murphy and Saucedo are the principals of and control the Sun Defendants, the Mission Defendants, and Defendant Integrity.

69.     At least some of the Lab Defendants have financial relationships with physicians throughout the United States, many of whom have contracts with Aetna that, *inter alia*, require

16

the physicians to refer patients to Aetna-contracted laboratories and medical facilities where medically feasible, and to comply with all applicable laws and regulations, including those relating to kickbacks and self-referrals.

### **The Defendants' Use of Newman To Perpetrate a Fraudulent Billing Scheme**

70. Since at least 2016, Defendants conspired to induce physicians throughout the country to refer patients' specimen to the Lab Defendants for various types of laboratory testing.

71. The patients whose specimens Defendants funneled to the Lab Defendants had *no connection to Newman*. The patients never visited Newman or received any services from Newman. Moreover, the lab specimens at issue were never analyzed at Newman.

72. Since at least 2016, Defendants have caused thousands of claim forms to be submitted to Aetna fraudulently misrepresenting that the underlying lab services were performed by and at Newman.

73. Defendants submitted, or caused the submission of, fraudulent claim forms bearing Newman's name and billing information in order to disguise themselves and to obtain reimbursement at the high rates in the Contract between Aetna and Newman.

74. Defendants also knew Aetna pays substantially more for claims submitted using Newman's name and billing information than it pays for legitimate claims submitted using names and billing information of out-of-network laboratories.

75. And Defendants understood that across the healthcare industry, rural hospitals are paid significantly more by the insurance carries with whom they contract than out-of-network, freestanding laboratories are paid for identical claims.

76. Thus, each Defendant played an interrelated role in this scheme. The PCH Defendants took control of Newman, caused Newman to enter contracts with the Lab

17

Defendants, PCH Lab #1 and PCH Lab #2, and submitted or caused the submission of claim forms that misrepresented Newman as having conducted laboratory tests at issue, when in reality it had not. The Lab Defendants induced physicians from across the country to send them blood and urine specimens to test, they purportedly performed these tests, and then submitted or caused the submission of claim forms to Aetna that fraudulently identified Newman as the entity that completed the lab tests. The Individual Defendants, through their ownership and control of the PCH Defendants and the Lab Defendants, were directly involved in creating, establishing, and implementing this scheme. The scheme had its intended impact, and Defendants funneled more than $21 million of improperly obtained reimbursements from Aetna through Newman and into their own pockets.

77.     The illustrations below demonstrate how Defendants' scheme operated in Pennsylvania and other states around the country.

**<u>Defendants' Pennsylvania-Based Fraud Scheme</u>**

78.     Defendants targeted their fraudulent scheme at employers and employees within Pennsylvania on numerous occasions, defrauding Aetna, as well as Pennsylvania employers and employees whose health plans Aetna administers, out of at least $231,596 between January 2016 and June 2017.

79.     Defendants induced physicians in Pennsylvania, who have no connection to Newman, to make referrals of Pennsylvania members' lab specimens to the Lab Defendants.

80.     After the Lab Defendants' received Pennsylvania members' specimens, Defendants submitted claims to Aetna for analysis of those specimens using Newman's name and billing information, expressly misrepresenting that the specimens were analyzed by and at

Newman even though the Pennsylvania members at issue never visited or formed any connection with Newman, and their specimens were never analyzed by or at Newman.

81.    For example, on July 13, 2016, Aetna member No. 2, a resident of Fairless Hill, Bucks County, Pennsylvania visited a physician in Bristol, Bucks County, Pennsylvania.  The physician took a specimen from Aetna Member No. 2, and Aetna remitted payment to the physician for doing so.

82.    The physician sent Aetna Member No. 2's specimen to one of the Lab Defendants for testing.  Aetna Member No. 2 never visited Newman and Newman never analyzed Aetna Member No. 2's specimen.  Nevertheless, on or about August 6, 2016, Defendants submitted, or caused the submission of, a claim form to Aetna misrepresenting that Aetna Member No. 2's specimen was analyzed by and at Newman in Shattuck, Oklahoma.  Just like the representative example set forth above in Paragraphs 35 and 36 (and those detailed below), the claim form for Aetna Member No. 2 listed Newman as the provider that performed the lab services at issue, and the claim form was submitted to Aetna using Newman's provider identification and billing information to further this lie.  Based on Defendants' affirmative misrepresentation and their failure to disclose the provider that actually performed the medical services, Aetna paid Newman $1,593.40 on or around August 6, 2016.  Pursuant to Defendants' fraudulent scheme, this money was distributed among the Defendants.

83.    Defendants repeated this same fraudulent scheme at least three more times with Aetna Member No. 2 alone, submitting fraudulent claims to Aetna misrepresenting that specimens drawn from Aetna Member No. 2 by a physician in Bucks County, Pennsylvania, were analyzed by Newman in Shattuck, Oklahoma on August 10, 2016, October 5, 2016 and

November 29, 2016. As a result of these misrepresentations by the Defendants, Aetna paid Newman an additional $5,389.20.

84. By directing their fraudulent activities at physicians and members in Pennsylvania, Defendants defrauded Aetna and employers and employees in this District whose health plans Aetna administers, including the Central Bucks School District, the Plumbers Local Union, the Bensalem County School District, the Bristol County School District and many others.

### Defendants' Systematic Fraud Beyond Pennsylvania

85. Aetna has compiled a list of the presently-known fraudulent claims at issue, which is incorporated into, relied upon as part of, and attached as Exhibit 1 to this Complaint. The list of claims contains the following detailed categories of information: the date of service, or "DOS," for each claim submitted by Defendants to Aetna for payment; the date that Aetna received the claim form that Defendants submitted or caused the submission of; the date that each claim form was processed and paid by Aetna; the name of the provider whose billing information was used by Defendants when submitting the claim forms (*i.e.*, Newman); the amount billed by Defendants on each claim form; and the amount that Aetna was fraudulently induced to pay for each individual claim. For purposes of patient confidentiality obligations, Aetna has not identified the patient associated with each claim. That information, to the extent needed, is or should be readily available to Defendants from their own records; and, it may be otherwise provided to Defendants and the Court upon entry of an appropriate qualified protective order and/or other protective measures to ensure compliance with privacy laws and regulations.

86. Each claim form identified in this list misrepresents on its face that the laboratory services were performed by and at Newman and for Newman patients, and omits the fact that the

Lab Defendants performed the lab tests. The following are additional representative examples of Defendants' fraudulent scheme, all of which are drawn from the list Aetna has compiled and attached hereto as Exhibit 1.

### Aetna Member No. 1

87.     Aetna Member No. 1 is a resident of Jacksonville, Florida who is covered by a health insurance plan administered by Aetna.

88.     On April 21, 2016, Aetna Member No. 1 visited a pain management practice located in Jacksonville, Florida.

89.     During the office visit on April 21, 2016, a physician from the pain management practice took a urine sample from Aetna Member No. 1 and conducted a basic point-of-care drug screening, which showed traces of Buprenorphine.

90.     The physician ordered further testing on Aetna Member No. 1's urine sample by filling out a requisition form addressed to Sun Ancillary Management, LLC, 45 Northeast Loop 410, Suite 215, San Antonio, TX 78216. The physician requested that the Sun Defendants "conduct additional tests" on Aetna Member No. 1's urine sample and submitted the sample to Sun Management.  The form also stated that the physician would receive remuneration for referring Aetna Member No. 1's specimen to Sun Lab.

91.     The requisition form for Aetna Member No. 1's sample identified Aetna under the form's "Insurance Information" section.

92.     Aetna Member No. 1's signature appears on the requisition form beneath a notice that the member's urine specimen would be sent to Sun Lab for further testing and processing.

93.     Newman never performed the lab testing the physician ordered from the Sun Defendants for Aetna Member No. 1.

94.      Nevertheless, on or around July 16, 2016, Defendants conspired to submit or cause the submission of a claim form to Aetna bearing Newman's name and billing information for laboratory services allegedly performed at Newman in Shattuck, Oklahoma on the urine sample of Aetna Member No. 1.

95.      The electronic claim form Defendants submitted or caused to be submitted to Aetna requested $2,500 for lab tests allegedly performed by and at Newman on Aetna Member No. 1's urine sample.

96.      Based on Defendants' misrepresentation that the urinalysis the physician ordered for Aetna Member No. 1 was performed by and at Newman, Aetna paid Newman $2,250, far more than it would have paid otherwise, if an in-network (or even out-of-network) laboratory properly billed Aetna for the same type of services. Pursuant to Defendants' fraudulent scheme, this money was distributed among the Defendants.

97.      On September 8, 2016, Integrity appealed Aetna's payment for the claim related to the Aetna member, again misrepresenting that the urinalysis ordered by the physician for Aetna Member No. 1 was performed by and at Newman, and requesting Aetna to pay the full amount of the charges Defendants submitted to Aetna related to Aetna Member No. 1.

98.      Furthermore, pursuant to his own separate contract with Aetna, the physician who sent Aetna Member No. 1's specimen to Sun Lab is obligated to refer lab work for Aetna-member patients like Aetna Member No. 3 to facilities that are part of Aetna's network where medically feasible. The physician is also obligated through his contract with Aetna to remain in compliance with all applicable laws and regulations, including anti-kickback and self-referral regulations. By paying physicians money in exchange for referrals, Sun Management tortiously

interfered with Aetna's contract with the physician by inducing a breach of multiple provisions of the Aetna contract.

### Aetna Member No. 3

99.     Aetna Member No. 3 is a resident of League City, Texas who is covered by a health insurance plan administered by Aetna.

100.     On October 13, 2016, Aetna Member No. 3 visited a primary care physician for an annual exam in Houston, Texas.

101.     During the exam, the physician collected a urine sample from Aetna Member No. 3 and ordered testing on Aetna Member No. 3's urine specimen from Gibson Diagnostic Labs. Specifically, the physician filled out a requisition form addressed to Gibson Diagnostic Labs, 813 N. O'Connor Rd, Irving, TX 75061. The form also indicates that Aetna Member No. 3's primary insurance coverage is through Aetna.

102.     It does not appear that the physician ordered urinalysis from Mission I, and Aetna Member No. 3 did not sign a requisition form for testing from Mission I.

103.     Nevertheless, a requisition form was somehow created and addressed to Mission I, and it purports to bear Aetna Member No. 3's signature and contain an order by the physician for lab testing by Mission I on Aetna Member No. 3's urine sample.

104.     Newman never performed the lab testing the physician ordered for Aetna Member No. 3.

105.     Despite Aetna Member No. 3's urine sample never being tested by or at Newman, on or around November 29, 2016, Defendants submitted or caused the submission of a claim form to Aetna bearing Newman's name and billing information for laboratory services allegedly performed at Newman in Shattuck, Oklahoma on the sample.

23

106.    The claim form Defendants submitted or caused to be submitted to Aetna billed $4,950.00 for lab tests allegedly performed by and at Newman on Aetna Member No. 3's urine sample.  The claim form misrepresented that the tests billed for were performed by and at Newman and omitted the fact that the tests were performed elsewhere.

107.    Based on Defendants' misrepresentation that the testing ordered for Aetna Member No. 4 was performed by and at Newman, Aetna paid Newman $1,660.11, which is far more than it would have paid otherwise, if an in-network (or even out-of-network) laboratory properly billed Aetna for the same type of services.  Pursuant to Defendants' fraudulent scheme, this money was distributed among the Defendants.

### *Aetna Member No. 4*

108.    Aetna Member No. 4 is a resident of Helotes, Texas who is covered by a health insurance plan administered by Aetna.

109.    On April 28, 2016, Aetna Member No. 4 visited a physician in San Antonio, Texas who collected a urine sample from Aetna Member No. 4.

110.    The physician ordered testing on Aetna Member No. 4's urine specimen from Mission I by filling out a requisition form addressed to Mission Toxicology, 2145 N.W. Military Hwy, Suite 102, Castel Hills, Texas 78213.  Through this form, the physician requested that Mission I "conduct additional tests" on the urine sample taken from Aetna Member No. 4 and sent to Mission I, which, upon information and belief, is managed by Mission Management.

111.    The requisition form filled out by the physician states "Mission Toxicology will confirm the validity of each specimen by analyzing creatine levels, specific gravity, and PH."

112.    Aetna Member No. 4's signature appears on the requisition form beneath a notice that Aetna Member No. 4's urine specimen would be sent to Mission Lab for further testing, and

a statement that "the lab [Mission] is authorized" to bill Aetna for testing Aetna Member No. 5's specimen.

113.    Newman never performed the lab testing the physician ordered from Mission I for Aetna Member No. 5

114.    Nevertheless, on or around July 20, 2016, Defendants submitted or caused the submission of a claim to Aetna bearing Newman's name and billing information for laboratory services allegedly performed at Newman in Shattuck, Oklahoma on the urine sample of Aetna Member No. 4 collected in San Antonio, Texas on April 28, 2016.

115.    The claim form Defendants submitted or caused to be submitted to Aetna billed $2,500 for lab tests allegedly performed by and at Newman on Aetna Member No. 4's urine sample.  The form misrepresented that the tests billed for were performed by and at Newman in Shattuck, Oklahoma and omitted the fact that the tests were performed elsewhere.

116.    Based on Defendants' misrepresentation that the urinalysis ordered for Aetna Member No. 4 was performed by and at Newman, Aetna paid Newman $2,250, which is far more than it would have paid otherwise, if an in-network (or even out-of-network) laboratory properly billed Aetna for the same type of services.  Pursuant to Defendants' fraudulent scheme, this money was distributed among the Defendants.

117.    On September 8, 2016, Integrity appealed Aetna's payment for the claim related to Aetna Member No. 4, again misrepresenting that the urinalysis ordered by the physician for Aetna Member No. 4 was performed by and at Newman, and requesting Aetna to pay the full amount of the charges Defendants submitted to Aetna related to Aetna Member No. 4.

118.    Pursuant to the physician's separate contract with Aetna, the physician is obligated to refer lab work for Aetna-member patients like Aetna Member No. 4 to facilities that

are part of Aetna's network where medically feasible. The physician is also obligated through the contract with Aetna to remain in compliance with all applicable laws and regulations, including anti-kickback and self-referral regulations. By paying money in exchange for the referral of Aetna Member No. 4's specimen, the Mission Defendants tortiously interfered with Aetna's contract with the physician by inducing the physician's breach of multiple provisions of his contract with Aetna.

### Aetna Member No. 5

119.    Aetna Member No. 5 is a resident of Granite City, Illinois who is covered by a health insurance plan administered by Aetna.

120.    On June 28, 2016, Aetna Member No. 5 visited a physician in Florissant, Missouri who drew a blood sample from Aetna Member No. 5.

121.    The physician ordered testing on Aetna Member No. 5's specimen from Sun Lab by filling out a requisition form addressed to Sun Clinical Laboratory, 102 Palo Alto, Suite 245, San Antonio, Texas 78211.  Through this form, the physician requested that Sun Lab conduct a "comprehensive panel" on the specimen taken from Aetna Member No. 5 and sent to Sun Lab, which, upon information and belief, is managed by Sun Management.

122.    Aetna Member No. 5's signature appears on the requisition form beneath a notice that Aetna Member No. 5's specimen would be sent to Sun Lab for further testing, and a statement that "the lab [Sun] is authorized" to bill Aetna for testing Aetna Member No. 5's specimen.

123.    Aetna Member No. 5's specimen was never sent to Newman and Newman never performed the lab testing the physician ordered from Sun Lab for Aetna Member No. 5.

124.     Nevertheless, on or around July 12, 2016, Defendants submitted or caused the submission of a claim to Aetna bearing Newman's name and billing information for laboratory services allegedly performed at Newman in Shattuck, Oklahoma on the urine sample of Aetna Member No. 5 collected in Florissant, Missouri on June 28, 2016.

125.     The form Defendants submitted or caused to be submitted to Aetna billed $3,819 for lab tests allegedly performed by and at Newman on Aetna Member No. 5's specimen, and the form misrepresented that the tests billed for were performed by and at Newman in Shattuck, Oklahoma.

126.     Based on Defendants' misrepresentation that the testing the physician ordered for Aetna Member No. 5 was performed by and at Newman, Aetna paid Newman $2,141.94 on July 20, 2016, which far more than it would have paid, if an in-network (or even out-of-network) laboratory properly billed Aetna for the same type of services. Pursuant to Defendants' fraudulent scheme, this money was distributed among the Defendants.

127.     On September 7, 2016, Integrity appealed Aetna's payment for the claim related to Aetna Member No. 5, again misrepresenting that the testing ordered for Aetna Member No. 5 was performed by and at Newman, and requesting Aetna to pay the full amount of the charges Defendants submitted to Aetna related to Aetna Member No. 5.

128.     In submitting an appeal to Aetna, Integrity enclosed a copy of the requisition form the physician used to order testing on Aetna Member No. 5's specimen from Sun Lab.  In order to make it look like the testing was performed at Newman, however, Integrity and/or other Defendants affixed a copy of Newman's logo next to Sun Lab's logo on the requisition form.

129.     Pursuant to the physician's own separate contract with Aetna, the physician is obligated to refer lab work for Aetna-member patients like Aetna Member No. 5 to facilities that

are part of Aetna's network where medically feasible. The physician is also obligated through his contract with Aetna to remain in compliance with all applicable laws and regulations, including anti-kickback and self-referral regulations. By paying money in exchange for the referral of Aetna Member No. 5's specimen, the Sun Defendants tortiously interfered with Aetna's contract with the physician by inducing the physician's breach of multiple provisions of his contract with Aetna.

## Defendants' Additional Misrepresentations

130. In addition to Defendants' submission of thousands of fraudulent claims, Guterman (PCH's President) and Wanger (the PCH-appointed interim CEO of Newman) made several misrepresentations in furtherance of the scheme when they expressly denied submitting claim forms to Aetna misrepresenting that Newman performed lab-related services actually rendered by the Lab Defendants.

131. Even though Newman's representatives have since admitted that the lab services were not performed at Newman and that Newman played no role in processing the lab specimens at issue, Guterman emailed Aetna on April 4, 2017 and misrepresented that Defendants billed only for "legitimate medical services that were analyzed on [Newman] hospital property."

132. Guterman made further misrepresentations to Aetna when he stated that Newman "is not involved with an under billing arrangement, but just the opposite NMH [Newman Memorial Hospital] has invested significant money and resources into analyzing many different blood and urine tests on hospital property."

133. Guterman went so far as to attach pictures of what he represented to be a laboratory facility on Newman's premises at which all of the lab services were performed.

134.    Representatives of Newman have since confirmed that Guterman's April 4, 2017 email was replete with misrepresentations, and that the lab services were not performed at or processed by Newman.

135.    Wanger compounded the scheme and cover-up with further misrepresentations to Aetna, stating that Newman is "extensively involved in processing these urine specimens."

136.    With respect to Aetna's question as to whether it was receiving bills from Newman for lab services that were not being performed at or processed by the hospital, Wanger stated "[t]hat simply is not true," and denied that Newman was not performing the services for which Defendants billed Aetna.

137.    As they did with respect to Guterman's email, Newman representatives have since confirmed that Wanger's September 26, 2016 letter was deceptive and contained lies.

138.    Defendants conspired to lure thousands of patients' specimens to the Lab Defendants through lies and financial inducements, and to submit fraudulent bills to Aetna in the same or similar fashion as Defendants did with the Aetna members described above.

139.    Some or all of the Defendants engaged in this scheme not only through Newman, but also other Aetna-contracted hospitals.

140.    Relying on Defendants' misrepresentations that the claims Defendants submitted or caused to be submitted to Aetna were accurate and were for services performed by and at Newman, Aetna paid, and Defendants took more than $21 million in connection with these fraudulently submitted claims.

### Newman Removes the PCH Defendants and Sues Defendants

141.    Newman recently filed suit against many of the Defendants seeking to terminate Defendants' control of and relationship with Newman, and seeking to recover damages including the money these Defendants funneled through Newman.

142.    Newman confirmed in its lawsuit that the PCH Defendants took control of its facility, caused Newman to violate its contract with Aetna, and fraudulently submitted lab claims misrepresenting that Newman performed lab services for patients whose laboratory tests were not performed actually performed by or at the hospital.

143.    As Newman explained in its pleading, the PCH Defendants acquired "nearly unfettered management and administrative control" over Newman; the PCH Defendants operated a "[s]cheme" using Newman; the PCH Defendants caused Newman to contract with the Lab Defendants; Defendants "submitted claims to private payors under Newman's provider identification number" even though the laboratory tests were not performed at or by Newman; and Defendants "[s]cheme" caused Newman to "violat[e]" its participating contracts with commercial insurance companies.  Newman further indicates in its court filing that the PCH Defendants purchased laboratory equipment, and hired a few employees for a "lab" at Newman that was not actually used, in order to make it appear that Newman was indeed performing laboratory work that it was not actually performing.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against All Defendants)

144.    Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full.

145.    Aetna has standing under 18 U.S.C. § 1964(c) to pursue this claim for a violation of 18 U.S.C. § 1962(c).

146.    Each of the PCH Defendants, the Lab Defendants, and the Individual Defendants is a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

147.    Newman is an enterprise within the meaning of 18 U.S.C. § 1961(4).  Newman has an ascertainable structure and purpose beyond the scope and commission of the Defendants' racketeering activity as alleged herein, and Newman is separate and distinct from each Defendant.  Specifically, Newman operates as a hospital in Shattuck, Oklahoma.

148.    At all relevant times, Newman was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  Such activities include, but are not limited to, purchasing medicine, supplies, and equipment from out-of-state sellers; providing healthcare to out-of-state patients; submitting healthcare claims to and receiving reimbursement from private commercial insurers and/or third-party administrators (including Aetna) located out-of-state or to the U.S. Government through Federal Medicare and Medicaid Programs; utilizing interstate mails and wires in the operation of its affairs and business, including in the submission of health care reimbursements claims, such as those at issue herein, and interstate mail and wire communications with insurers and health plan claim administrators such as Aetna..

149.    The PCH Defendants and Guterman were engaged in activities including, but not limited to, conducting and/or participating in the affairs of Newman and managing its operations, which includes submitting claims to and receiving reimbursement from private commercial insurers and/or third-party administrators (including Aetna) located out-of-state; and entering into and performing contracts on behalf of Newman with out-of-state entities including the Lab Defendants.

150.    The Lab Defendants, Murphy, and Saucedo and the other Individual Defendants were engaged in activities including, but not limited to, conducting and/or participating in the affairs of Newman and in-taking, handling, and processing specimens referred by out-of-state physicians for out-of-state Aetna members for use in submitting claims through Newman, and processing and submitting claims under the name and auspices of Newman to private commercial insurers and/or third-party administrators (including Aetna) located out-of-state, as well as facilitating and overseeing these activities.

151.    Pursuant to and in furtherance of their fraudulent schemes, Defendants committed multiple related acts of mail and wire fraud, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Defendants' conduct constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

152.    The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Aetna.  Specifically, beginning on or about January 1, 2016, and continuing through to the present, Defendants committed two or more of the racketeering activities described below.

a.    Defendants devised a scheme or artifice to defraud Aetna and the employers and employees whose health plans Aetna administers by intentionally submitting, or intentionally causing the submission of, thousands of claim forms, including the claims forms for the claims specifically identified in Exhibit 1, through the mails and/or wires to Aetna using Newman's name and billing information and misrepresenting that the services had been performed by and at Newman, and omitting the fact that in truth, the services were performed (if at all) by the Lab Defendants.

b.    Defendants devised a scheme or artifice to defraud Aetna and the employers and employees whose health plans Aetna administers by entering into a series arrangements aimed at maximizing the number of specimens referred to the Lab Defendants.  Specifically, the Lab Defendants entered into arrangements with physicians (some of whom have contracts with Aetna) whereby the physicians were induced to refer Aetna members' specimens to the Lab Defendants.

c.    Defendants devised a scheme or artifice to defraud Aetna and the employers and employees whose health plans Aetna administers by entering into a series of arrangements aimed at maximizing the number of claims fraudulently submitted through the mails and/or wires to Aetna.  Specifically, upon Aetna issuing payment to Newman for claims that had been fraudulently submitted through the mails and/or wires, the PCH Defendants took a portion of the money for themselves (and Guterman) and kicked back money to the Lab Defendants (and Murphy and Saucedo) in exchange for the submission of claims using Newman's name and billing information, which misrepresented that the lab services at issue were performed by and at Newman.

153.    The acts of mail and/or wire fraud described above constitute a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) because there were multiple acts of racketeering activity within the past ten years.

154.    The acts alleged herein were necessary for Defendants to execute the scheme to defraud private commercial insurers and/or third-party administrators (including Aetna).  The acts alleged were also related to each other by virtue of common participants, common victims, a common method of commission, a common purpose, and a common method of defrauding

private commercial insurers and/or third-party administrators (including Aetna) for the purpose of enriching Defendants while concealing their fraudulent activities.

155.    The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

156.    Aetna reasonably relied on Defendants' misrepresentations that were part of Defendants' scheme to defraud and engage in racketeering activities.

157.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), and by reason of the violations of 18 U.S.C. §1962(c), Aetna and the employers and employees whose health plans Aetna administers have been injured in their business and property in that Aetna, the employers and employees have paid out at least $21 million due to Defendants' fraudulent billing schemes and operations.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Actual damages in an amount to be determined at trial;

(b)  Treble damages pursuant to 18 U.S.C. § 1964(c);

(c)  Costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and

(d)  Such other and further relief as this Court may deem just and equitable.

## SECOND CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against All Defendants)

158.    Aetna repeats and re-alleges all prior paragraphs of the Complaint as if set forth in full.

159.    Aetna has standing under 18 U.S.C. § 1964(c) to pursue this claim for a violation of 18 U.S.C. § 1962(c).

160.     Each of the PCH Defendants, the Lab Defendants, and the Individual Defendants is a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

161.     The association-in-fact consisting of each of the Defendants and other associated persons constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4).  This association-in-fact has an ascertainable structure and purpose beyond the scope and commission of the Defendants' racketeering activity, as alleged herein, and it is separate and distinct from each Defendant.

162.     At all relevant times, the association-in-fact enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  Such activities include, but are not limited to, managing and working with Newman in its operations; purchasing medicine, supplies, and equipment from out-of-state sellers; providing healthcare to out-of-state patients; submitting healthcare claims to and receiving reimbursement from private commercial insurers and/or third-party administrators (including Aetna) located out-of-state or to the U.S. Government through Federal Medicare and Medicaid Programs; utilizing interstate mails and wires in the operation of its affairs and business, including in the submission of health care reimbursements claims, such as those at issue herein, and interstate mail and wire communications with insurers and health plan claim administrators such as Aetna..

163.     The PCH Defendants and Guterman were engaged in activities including, but not limited to, conducting and/or participating in the affairs, and managing the operations, of Newman and the association-in-fact enterprise, which includes submitting claims to and receiving reimbursement from private commercial insurers and/or third-party administrators (including Aetna) located out-of-state; and entering into and performing contracts on behalf of Newman with out-of-state entities including the Lab Defendants.

164.    The Lab Defendants and the other Individual Defendants were engaged in activities including, but not limited to, conducting and/or participating in the affairs, and managing the operations, of Newman and the association-in-fact enterprise, in-taking, handling, and processing for use in submitting claims through Newman specimens referred by out-of-state physicians for out-of-state Aetna members, and processing and submitting claims under the name and auspices of Newman to private commercial insurers and/or third-party administrators (including Aetna) located out-of-state, as well as facilitating and overseeing these activities.

165.    Pursuant to and in furtherance of their fraudulent schemes, Defendants committed multiple related acts of mail and wire fraud, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Defendants' conduct constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

166.    The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Aetna.  Specifically, beginning on or about January 1, 2016, and continuing through to the present, Defendants committed two or more of the racketeering activities described below.

a.    Defendants devised a scheme or artifice to defraud Aetna and the employers and employees whose health plans Aetna administers by intentionally submitting, or intentionally causing the submission of, thousands of claim forms, including the claims forms for the claims specifically identified in Exhibit 1,  through the mails and/or wires to Aetna using Newman's name and billing information and misrepresenting that the services had been performed by and at Newman, and omitting the fact that in truth, the services were performed (if at all) by the Lab Defendants.

b.     Defendants devised a scheme or artifice to defraud Aetna and the employers and employees whose health plans Aetna administers by entering into a series of arrangements aimed at maximizing the number of specimens referred to the Lab Defendants.  Specifically, the Lab Defendants entered into arrangements with physicians (some of whom have contracts with Aetna) whereby the physicians were induced to refer Aetna members' specimens to the Lab Defendants.

c.     Defendants devised a scheme or artifice to defraud Aetna and the employers and employees whose health plans Aetna administers by entering into a series of arrangements aimed at maximizing the number of claims fraudulently submitted through the mails and/or wires to Aetna.  Specifically, upon Aetna issuing payment to Newman for claims that had been fraudulently submitted through the mails and/or wires, the PCH Defendants took a portion of the money for themselves (and Guterman) and kicked back money to the Lab Defendants (and Murphy and Caucedo) in exchange for the submission of claims using Newman's name and billing information, which misrepresented that the lab services at issue were performed by and at Newman.

167.   The acts of mail and/or wire fraud described above constitute a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5) because there were multiple acts of racketeering activity within the past ten years.

168.   The acts alleged herein were necessary for Defendants to execute the scheme to defraud private commercial insurers and/or third-party administrators (including Aetna).  The acts alleged were also related to each other by virtue of common participants, common victims, a common method of commission, a common purpose, and a common method of defrauding

private commercial insurers and/or third-party administrators (including Aetna) for the purpose of enriching Defendants while concealing their fraudulent activities.

169.    The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

170.    Aetna reasonably relied on Defendants' misrepresentations that were part of Defendants' scheme to defraud and engage in racketeering activities.

171.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), and by reason of the violations of 18 U.S.C. §1962(c), Aetna and the employers and employees whose health plans Aetna administers have been injured in their business and property in that Aetna, the employers and employees have paid out at least $21 million due to Defendants' fraudulent billing schemes and operations.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(e)    Actual damages in an amount to be determined at trial;

(f)    Treble damages pursuant to 18 U.S.C. § 1964(c);

(g)    Costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and

(h)    Such other and further relief as this Court may deem just and equitable.

### THIRD CAUSE OF ACTION
#### (Violation of 18 U.S.C. § 1962(d) Against All Defendants)

172.    Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

173.    From at least 2016 through the present, each of the Defendants did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree together with each other

or some or all other Defendants to engage in the aforesaid conduct in violation of 18 U.S.C. §1962(c), as set forth in each of the foregoing causes of action.

174.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) and (d), and by reason of the violations of 18 U.S.C. §1962(c) and (d), Aetna and the employers and employees whose health plans Aetna administers have been injured in their business and property in that Aetna, the employers and employees have paid out at least $21 million due to Defendants' fraudulent billing schemes and operations.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Actual damages in an amount to be determined at trial;

(b)  Treble damages pursuant to 18 U.S.C. § 1964(c);

(c)  Costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and

(c)  Such other and further relief as this Court may deem just and equitable.

## FOURTH CAUSE OF ACTION
### (Fraud Against All Defendants)

175.    Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

176.    Since at least 2016, the Defendants have submitted, or caused to be submitted, thousands of claims to Aetna using Newman's name and billing information and misrepresenting that Newman was the service provider despite knowing that Newman had not provided the services that Aetna was being billed for.

177.    Defendants have also submitted, or caused the submission of, numerous claim forms to Aetna using the names and billing information of Aetna-affiliated facilities other than

Newman despite knowing that those Aetna-affiliated facilities had not provided the services for which Aetna was billed.

178.     Defendants' submission of these claim forms using the names and billing information of Newman and other Aetna-affiliated facilities were material and false representations reflecting that Newman and the other Aetna-contracted facilities had performed the services billed for in connection with the claims submitted to Aetna by the Defendants. When submitting these claims, Defendants omitted the fact that the lab services were in fact performed by completely different laboratories.

179.     The Individual Defendants knowingly participated in the Defendants' fraud by orchestrating and implementing the fraudulent billing scheme between Defendants and Aetna-affiliated hospitals, including Newman, and by directing the submission of claims to Aetna using the names and billing information of Newman and other Aetna-affiliated facilities.

180.     The Defendants submitted the claims using the names and billing information of Newman and other Aetna-affiliated facilities knowing that Aetna would rely on these misrepresentations in issuing payment to Newman.

181.     Relying on the purported truth and accuracy of the bills representing that Newman and other Aetna-contracted facilities had provided the services billed for, Aetna rightfully and justifiably relied on these representations in issuing payment at contractual reimbursement rates that Aetna negotiated with Newman and other Aetna-affiliated facilities.

182.     As a result of the Defendants' wanton and malicious fraudulent actions, Aetna and the employers and employees whose health plans Aetna administers have been damaged.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Actual damages in excess of $150,000, exclusive of interest and costs;

(b)  Punitive damages; and

(c)  Such other and further relief as this Court may deem just and equitable.

### FIFTH CAUSE OF ACTION
**(Negligent Misrepresentation Against All Defendants)**

183.    Aetna repeats and realleges all prior paragraphs of the Petition as if set forth in full here.

184.    By submitting, or causing the submission of, claims to Aetna using the names and billing information of Newman and other Aetna-affiliated facilities despite knowing that Newman and the other Aetna-affiliated facilities had not provided the services being billed for, Defendants supplied false information to Aetna in the course of the Defendants' business.

185.    The Individual Defendants orchestrated and directed the Defendants' misrepresentations to Aetna.

186.    Defendants failed to exercise reasonable care or competence in making such representations to Aetna.

187.    Aetna justifiably relied on the Defendants' misrepresentations in issuing payment at contractual reimbursement rates that Aetna negotiated with Newman and other Aetna-affiliated facilities.

188.    The Defendants' negligent misrepresentations proximately caused Aetna, and the employers and employees whose health plans Aetna administers, to suffer damages.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Actual damages in excess of $150,000, exclusive of interest and costs; and

(b)  Such other and further relief as this Court may deem just and equitable.

## SIXTH CAUSE OF ACTION
### (Money Had and Received Against All Defendants)

189. Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

190. By submitting, or causing the submission of, false claims to Aetna using the names and billing information of Newman and other Aetna-affiliated facilities and by receiving payment from Aetna through Newman and other Aetna-affiliated facilities, Defendants have received money which in equity and good conscience belongs to Aetna and the employers and employees whose health plans Aetna administers.

191. As a result of Defendants' actions, Aetna, and the employers and employees whose health plans Aetna administers, have suffered damages.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a) Actual damages in excess of $150,000, exclusive of interest and costs; and

(b) Such other and further relief as this Court may deem just and equitable.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)

192. Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

193. Defendants fraudulently used the names and billing information of Newman and other Aetna-affiliated facilities to submit, or causing the submission of, claims to Aetna for services that were not performed at or by Newman or the other Aetna-affiliated facilities whose names and billing information appeared on the bills Defendants submitted to Aetna.

194.    Aetna, relying on Defendants' representations that the services being billed for were performed at and by Newman in Shattuck, Oklahoma, as well as the other Aetna-affiliated facilities whose names and billing information appeared on the bills Defendants submitted to Aetna, issued payment to Newman and the other Aetna-affiliated facilities.

195.    Defendants have wrongfully obtained the payments issued by Aetna to Newman and other Aetna-affiliated facilities through fraudulent conduct.

196.    Because of Defendants' fraudulent conduct, it is unconscionable for Defendants to retain the payments.

197.    As a result of Defendants' actions, Aetna, as well as the employers and employees whose health plans Aetna administers, have been damaged.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Actual damages in excess of $150,000, exclusive of interest and costs; and

(b)  Such other and further relief as this Court may deem just and equitable.

### EIGHT CAUSE OF ACTION
**(Civil Conspiracy Against All Defendants)**

198.    Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

199.    The Defendants agreed and conspired with one another to engage in a course of conduct to commit fraud against Aetna and the employers and employees whose health plans Aetna administers by submitting, or causing the submission of, claim forms to Aetna for payment for services using the names and billing information of Newman and other Aetna-affiliated facilities, which services Defendants fraudulently misrepresented as having been performed at Newman and other Aetna-affiliated facilities.

200.    As a result of Defendants' wanton and malicious actions, Aetna, as well as the employers and employees whose health plans Aetna administers, have suffered damages.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Actual damages in excess of $150,000, exclusive of interest and costs;

(b)  Punitive damages; and

(c)  Such other and further relief as this Court may deem just and equitable.

### NINTH CAUSE OF ACTION
**(Tortious Interference Against All Defendants)**

201.    Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

202.    Aetna Health has contracted with Newman for Newman to serve as a participating provider in Aetna's network.

203.    Pursuant to the Contract, Aetna is required to remit payment to Newman only for services provided to Aetna members by and at Newman.

204.    The Contract also prohibits Newman from disclosing the contents of the Contract or any information developed by or belonging to Aetna, including its rates and procedures.

205.    Defendants willfully and intentionally interfered with Aetna's rights under the contract by using Newman's name and billing information to submit, or cause the submission of, claims to Aetna bearing Newman's name and billing information and misrepresenting that services provided elsewhere were provided by and at Newman, and by taking and utilizing Aetna's confidential and proprietary business information.

206.    Defendants' interference was malicious and wrongful, and such interference was neither justified, privileged, nor excusable.

207. Defendants' willful, intentional, wanton and malicious conduct proximately caused Aetna, and the employers and employees whose health plans Aetna administers, to suffer damages.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a) Actual damages in excess of $150,000, exclusive of interest and costs;

(b) Punitive damages; and

(c) Such other and further relief as this Court may deem just and equitable.

### THENTH CAUSE OF ACTION
### (Tortious Interference Against the Lab Defendants)

208. Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

209. Aetna has entered into separate provider contracts with physicians that referred specimens to the Lab Defendants in furtherance of the fraudulent scheme described herein.

210. Aetna's contracts with these physicians require that the physicians refer lab work for Aetna-member patients to facilities that are part of Aetna's network where medically feasible. The physicians are also contractually obligated to remain in compliance with all applicable laws and regulations, including anti-kickback and self-referral laws and regulations.

211. The Lab Defendants willfully and intentionally interfered with Aetna's rights under its contracts with providers by providing physicians with remuneration to induce the referral of patient specimens to the Lab Defendants.

212. The Lab Defendants' willful, intentional, wanton and malicious conduct proximately caused Aetna, and the employers and employees whose health plans Aetna administers, to suffer damages.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against the Lab Defendants and award Aetna the following relief:

(a)  Actual damages in excess of $150,000, exclusive of interest and costs;

(b)  Punitive damages; and

(c)  Such other and further relief as this Court may deem just and equitable.

### ELEVENTH CAUSE OF ACTION
**(Permanent Injunctive Relief Against All Defendants)**

213.    Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

214.    Defendants have engaged, and continue to engage, in a widespread fraudulent billing scheme by, among other things, submitting claims to Aetna using the names and billing information of Newman and other Aetna-affiliated facilities, and misrepresenting that Newman and other Aetna-affiliated facilities provided services to Aetna members, even though Newman and the other Aetna-affiliated facilities have nothing to do with the services being billed for, and by double billing Aetna for services.

215.    Because Defendants' conduct is ongoing, Aetna continues to suffer imminent harm.

216.    Aetna will suffer irreparable harm in the absence of injunctive relief as Defendants will continue to perpetuate the fraudulent billing schemes described herein.

217.    Because Defendants' conduct is ongoing, Aetna's future damages are incalculable and Aetna lacks an adequate remedy at law.

218.    Defendants conduct continues to harm Aetna, and the employers and employees whose health plans Aetna administers.

219.     Because this harm is ongoing and because Aetna and the employers and employees whose health plans Aetna administers, Aetna has, and will continue to suffer irreparable harm in the absence of this Court entering injunctive relief in Aetna's favor.

WHEREFORE, Aetna respectfully request that this Court enter judgment in its favor and against Defendants and award Aetna the following relief:

(a)  Injunctive relief permanently enjoining Defendants from conducting the fraudulent and wrongful billing schemes described herein; and

(b)  Such other and further relief as this Court may deem just and equitable.

### TWELFTH CAUSE OF ACTION
#### (Equitable Accounting Against All Defendants)

220.     Aetna repeats and realleges all prior paragraphs of the Complaint as if set forth in full here.

221.     An equitable accounting is warranted in this action due to the complex nature of Defendants' fraudulent schemes coupled with the number and types of Defendants that took portions of Aetna's payments to Newman.

222.     An accounting is necessary for the purpose of justice between the parties.

223.     Adequate relief may not be obtained at law.

WHEREFORE, Aetna respectfully requests that this Court enter judgment in its favor and against the Defendants and award Aetna the following relief:

(a)  An equitable accounting of Defendants' accounts; and

(b)  Such other and further relief as this Court may deem just and equitable.

**JURY DEMAND**

Aetna demands a trial of this action by jury on all issues so triable.

ELLIOTT GREENLEAF, P.C.

/s/ Frederick P. Santarelli
JOHN M. ELLIOTT
jme@elliottgreenleaf.com
FREDERICK P. SANTARELLI
fpsantarelli@elliottgreenleaf.com
BRIAN GRADY
briangrady@elliottgreenleaf.com
GREGORY S. VOSHELL
gsv@elliottgreenleaf.com
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
T: 215-977-1000
F: 215-977-1099


**MCGUIREWOODS LLP**

RONALD G. FRANKLIN (*pro hac vice
application forthcoming*)
rfranklin@mcguirewoods.com
KATE SEMMLER CORNELIUS (*pro hac vice
application forthcoming*)
kcornelius@mcguirewoods.com
BRETT BARNETT (*pro hac vice application
forthcoming*)
bbarnett@mcguirewoods.com
JPMorgan Chase Tower
600 Travis Street, Suite 7500
Houston, TX 77002-2906
T: 832-214-9942
F: 713-571-9652